934 F.2d 912
 59 USLW 2738, 67 Ed. Law Rep. 1084
 Rudy PULIDO; John M. Swomley; and, G. Hugh Wamble, Appellees,
v.
Lauro F. CAVAZOS, individually and as Secretary of U.S.
Department of Education; United States Department
of Education; and, Blue Hills Homes
Corporation, Appellants.
Ronald Jones; Theresa Jones; Grace Moorning; William
Grahl; Julia Ann Grahl; Dwayne Johnson; Barbara Johnson;
Daniel Hof; Linda Hof; Pamela Joan Brobst; Linda Johnson;
Gerald Dunn; Mary Dunn; Michael Ewing; Jo Ellen Ewing;
Kenneth Menges; Carol Menges; Dr. John Senott; Marcia
Senott; Sharon Spinks; Connie Welschmeyer; Jess Smith;
and, Rosa Smith, Intervenors below.
Rudy PULIDO; John M. Swomley; and, G. Hugh Wamble, Appellees,
v.
Lauro F. CAVAZOS, individually and as Secretary of U.S.
Department of Education; United States Department
of Education; and, Blue Hills Homes
Corporation.
Ronald Jones; Theresa Jones; Grace Moorning; William
Grahl; Julia Ann Grahl; Dwayne Johnson; Barbara Johnson;
Daniel Hof; Linda Hof; Pamela Joan Brobst; Linda Johnson;
Gerald Dunn; Mary Dunn; Michael Ewing; Jo Ellen Ewing;
Kenneth Menges; Carol Menges; Dr. John Senott; Marcia
Senott; Sharon Spinks; Connie Welschmeyer; Jess Smith;
and, Rosa Smith, Appellants, (Intervenors below).
Rudy PULIDO; John M. Swomley; and, G. Hugh Wamble, Appellants,
v.
Lauro F. CAVAZOS, individually and as Secretary of U.S.
Department of Education; United States Department
of Education; and, Blue Hills Homes
Corporation, Appellees.
Ronald Jones; Theresa Jones; Grace Moorning; William
Grahl; Julia Ann Grahl; Dwayne Johnson; Barbara Johnson;
Daniel Hof; Linda Hof; Pamela Joan Brobst; Linda Johnson;
Gerald Dunn; Mary Dunn; Michael Ewing; Jo Ellen Ewing;
Kenneth Menges; Carol Menges; Dr. John Senott; Marcia
Senott; Sharon Spinks; Connie Welschmeyer; Jess Smith;
and, Rosa Smith, Appellees, (Intervenors below).
 Nos. 90-1191, 90-1239 and 90-1240.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 8, 1990.
Decided May 21, 1991.
Rehearing and Rehearing En Banc Denied
July 24, 1991.
 
 Howard Scher and Kevin T. Baine, Washington, D.C., for appellants.
 Lee Boothby, Berrien Springs, Mich., and Patricia Brannon, Washington, D.C., for appellees.
 Before JOHN R. GIBSON, MAGILL and BEAM, Circuit Judges.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Once again the constitutionality of certain provisions of Chapter 1 of Title I of the Education Consolidation and Improvement Act of 1981, 20 U.S.C. Secs. 2701-3386 (1988), providing remedial education to low income students in parochial schools is before this court. Rudy Pulido, John M. Swomley and G. Hugh Wamble[1] filed a suit to challenge the use of mobile and portable classrooms to provide remedial services to educationally deprived children enrolled in private schools and the formula for allocating the cost of such services between private and public schools. The district court held that the placement of mobile and portable classroom units on parochial school property violated the first amendment's establishment clause, but that the placement of the units on public property located near the parochial schools did not. The district court also held that the provisions of the statute allowing the Secretary to bypass the local educational agency and prescribing the method for allocating the costs of the bypass were constitutional, but that the method of allocating the costs incurred as a result of Aguilar v. Felton, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), violated the first amendment's prohibition against the establishment of religion. We affirm the district court's holding that the use of mobile and portable classroom units off the private school property is constitutional, but reverse the district court's rulings that parking the units on parochial school property and the method of allocating Felton costs is unconstitutional.
 
 
 2
 This case dates back to 1985, when a group of plaintiffs filed a suit challenging certain provisions of Chapter 1 of the Education Consolidation and Improvement Act of 1981, 20 U.S.C. Secs. 2701-3386 (1988). In 1986, the district court dismissed nine of the eleven plaintiffs prior to trial because as federal taxpayers they lacked standing. After trial, the district court granted defendants' motion to dismiss the remaining two plaintiffs because one lacked standing and because the claims of the other had become moot. We affirmed the district court's dismissal. Pulido v. Bennett, 848 F.2d 880, 889 (8th Cir.1988).
 
 
 3
 About one month after this court affirmed the district court's dismissal, the Supreme Court held that taxpayers have standing to bring first amendment establishment clause challenges to programs such as Title I.[2] Bowen v. Kendrick, 487 U.S. 589, 618-20, 108 S.Ct. 2562, 2579-80, 101 L.Ed.2d 520 (1988). Accordingly, this court vacated its original decision and remanded the case to the district court, ordering the reinstatement of the federal taxpayers. Pulido v. Bennett, 860 F.2d 296, 298 (8th Cir.1988). In addition, a group of parents of parochial school students eligible for Chapter 1 services intervened to support the use of mobile and portable units to provide Chapter 1 services to parochial school students and the method of allocating the costs of such services. The district court heard additional testimony and ordered additional briefing on the merits of Pulido's claims.
 
 
 4
 Chapter 1 services are usually administered by local educational agencies in each state. See 20 U.S.C. Secs. 2727(a), 2891(12). Section 2727(b) authorizes the Secretary to bypass local educational agencies in administering Chapter 1 services, however, "[i]f a local educational agency is prohibited by law from providing" services to children enrolled in private schools, or if the local educational agency has "... substantially failed to provide for the participation on an equitable basis" of private school students. 20 U.S.C. Secs. 2727(b)(1) and (2). In 1976, the Commissioner of Education determined that four local educational agencies in Missouri "substantially failed to provide for the participation [of private school students] on an equitable basis," and that a bypass was warranted. Wamble v. Bell, 598 F.Supp. 1356, 1361-62 (W.D.Mo.1984), appeal dismissed, 473 U.S. 922, 105 S.Ct. 3549, 87 L.Ed.2d 672 (1985). Subsequently, the Missouri Supreme Court held that Missouri's constitution prohibited state involvement in the use of Title I funds for instruction provided on the premises of parochial schools. Mallory v. Barrera, 544 S.W.2d 556, 561 (Mo.1976) (en banc). As a result, the Secretary of Education utilized the bypass provision of 20 U.S.C. Sec. 2727 and contracted with Blue Hills Homes Corporation to provide Chapter 1 services in Missouri.
 
 
 5
 There has been extensive litigation concerning the constitutionality of providing Chapter 1 services to parochial school students in Missouri. In Wheeler v. Barrera, 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974), the Supreme Court affirmed the Eighth Circuit, holding that Missouri was "not obligated by Title I to provide on-the-premises instruction" to parochial school students, but that the parochial school students must be "provide[d] 'comparable' services." Id. at 419, 94 S.Ct. at 2284. Following Wheeler, parochial school students in Missouri who qualified for Chapter 1 services received the services in their parochial school classrooms.
 
 
 6
 The constitutionality of the bypass and the practice of providing Chapter 1 services at parochial schools was challenged in Wamble, 598 F.Supp. at 1359. The district court held the bypass provision constitutional, concluding that the Secretary's decision to invoke the bypass was rationally based and "necessitated by Missouri law." Id. at 1365. The court, however, enjoined the practice of providing Chapter 1 services in parochial schools as unconstitutional under the establishment clause of the first amendment, but stayed its order enjoining the practice pending a decision by the Supreme Court in a similar New York case. Id. at 1374. After the Supreme Court ruled that providing Chapter 1 services in religiously-affiliated private school buildings violated the establishment clause of the first amendment, Felton, 473 U.S. at 408-14, 105 S.Ct. at 3235-39, the district court entered its order enjoining the practice of providing Chapter 1 services at parochial schools in Missouri.
 
 
 7
 Following Felton, Blue Hills continued to provide Chapter 1 services to parochial school students. In compliance with Felton, however, Blue Hills did not provide these services in parochial school buildings, but instead used space leased in public or private nonsectarian buildings or mobile and portable classrooms.
 
 
 8
 The contract between Blue Hills and the Department of Education requires that all facilities used to provide Chapter 1 services be "religiously neutral." The mobile classroom units used to provide Chapter 1 services consist of vans and recreational vehicles that have been modified for use as classrooms. The portable units consist of trailers and prefabricated buildings modified for use as classrooms. During the 1988-89 school year, mobile and portable units were used at 104 sites in Missouri. When feasible, Blue Hills parks the units on public streets, on other public property, or on private property not owned by the private school or any related religious organization. In some instances, however, Blue Hills has not been able to park units at such places because they were either unsafe or unavailable. In those instances, Blue Hills parks the units on private school property--typically on a parking lot, driveway or playground. At 19 of the sites using mobile and portable units, Blue Hills was not able to park the units off the parochial school property, and at those sites, Blue Hills used 18 mobile units and one portable unit to provide Chapter 1 services. When Blue Hills parks units on parochial school property, they are parked as far as possible from the school buildings. The Department of Education has advised Blue Hills "to investigate every other possibility before parking mobile units on property that is owned by the school."
 
 
 9
 Pulido challenged the parking of units both on and off the premises of parochial schools as an unconstitutional establishment of religion. The district court held that the use of mobile and portable classroom units parked on public property adjacent to the parochial schools was constitutional, but that the use of such units parked on parochial school property was not. Pulido, 728 F.Supp. 574, 594 (W.D.Mo.1989). Pulido appeals the district court's ruling holding that Chapter 1 services could be provided in units parked off the property of the parochial schools. The parents and Secretary appeal the ruling holding that Chapter 1 services could not be provided in units parked on the parochial school property.
 
 
 10
 Pulido also challenged the Secretary's decision to implement the bypass, and the allocation of funds to pay for the costs of bypass and the costs incurred as a result of the Supreme Court's decision in Felton. In distributing funds appropriated by Congress for Chapter 1, the Department of Education determines the grant for each state by a formula tied to the number of low-income children in each state and the state's per-pupil expenditure. See 20 U.S.C. Sec. 2711. Missouri has allocated the administrative costs of operating the bypass and the costs incurred as a result of the Felton case out of the state's entire Chapter 1 allocation, (i.e. "off-the-top"), rather than allocating those costs from that portion of the Chapter 1 monies that would otherwise be spent for private school students. Pulido contends that by paying for bypass and Felton costs out of Missouri's total allocation, the government is impermissibly advancing religion and, therefore, violating the establishment clause.
 
 
 11
 The district court concluded that Pulido's challenge to the Secretary's decision to implement the bypass was barred by res judicata.[3] Pulido, 728 F.Supp. at 579. The district court also held that the Secretary's decision to take costs incurred in administering the bypass off-the-top of Missouri's Title I fund allocation was constitutional, but that the Secretary's decision to treat the costs incurred as a result of Felton off the top violated the establishment clause. Id. at 587. Pulido appeals the district court ruling holding that the Secretary could take bypass costs off the top. The parents and Secretary appeal from the ruling prohibiting the Secretary from taking Felton costs off the top.
 
 I.
 
 12
 The Secretary and parochial school parents first contend that the district court erred in ruling that providing Chapter 1 services in mobile and portable units parked on parochial school property violated the establishment clause of the first amendment. Pulido, on the other hand, argues that the court correctly ruled that the use of mobile and portable units parked on the parochial school property violated the establishment clause but that the district court should have gone further and ruled that the use of the mobile and portable units on public property adjacent to the parochial schools was also unconstitutional.
 
 
 13
 A statute or governmental action is consistent with the establishment clause of the first amendment if: (1) it has a secular legislative purpose; (2) its principal or primary effect is neither to advance nor inhibit religion; and (3) it does not foster excessive government entanglement with religion. Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111-12, 29 L.Ed.2d 745 (1971). The district court held that providing Chapter 1 services both on and off parochial school property had a secular legislative purpose, Pulido, 728 F.Supp. at 588, and did not result in excessive government entanglement. Id. at 593. The court further held that providing the services in units parked on public property did not have the primary effect of advancing religion, but that parking the units on parochial school property did have the primary effect of advancing religion, and therefore, violated the establishment clause. Id. at 591.
 
 
 14
 With respect to the constitutionality of parking the mobile and portable units on public property, the district court acknowledged Pulido's argument that parking the units on either public or private property created a "symbolic union" between federal funds and parochial schools. Id. at 588. The court went on to observe that the determination of a neutral site for providing such educational services to parochial school students required the court to draw extremely fine lines. Id. at 592. The essence of the district court's holding was that Chapter 1 services must be provided to parochial school students, and that "providing those services off the premises of the private school serves as enough of a separation to satisfy the first amendment." Id. Although the district court acknowledged that the units placed on public property adjacent to the private schools were, in many instances, "actually physically closer to the private schools than ... many of the ... units located directly on the private [school] property," the court concluded that providing Chapter 1 services in units parked off the property of the parochial schools did not have the primary effect of advancing religion and did not violate the establishment clause. Id.
 
 
 15
 The district court went on, however, to hold that parking the units on the parochial school property created an "impermissible link between the church and the state." Id. at 591. The court reasoned that if the units were parked on the parochial school premises, the units would be perceived as an "annex to the mission of the church," and as a result, would have the primary effect of advancing religion. Id.
 
 
 16
 Four Supreme Court cases provide guidance on the constitutionality of providing Chapter 1 services in, on, and near parochial school property. In Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), the Supreme Court struck down a statute providing for the loan of state-paid professional staff, including teachers, to private schools. Id. at 367-72, 95 S.Ct. at 1764-67. The staff provided guidance, testing, remedial, and therapeutic services to parochial school students in their parochial school classrooms. Id. at 367, 95 S.Ct. at 1764. The Supreme Court held that providing public school teachers to pervasively sectarian parochial schools violated the establishment clause, because the process of ensuring that public school teachers would not advance the religious mission of the schools served would result in excessive entanglement. Id. at 371-72, 95 S.Ct. at 1766-67. "[C]omprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that ... the First Amendment [is] respected." Id. at 370, 95 S.Ct. at 1765 (quoting Lemon, 403 U.S. at 616-19, 91 S.Ct. at 2113-14).
 
 
 17
 Two years later, in Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), the Supreme Court held that "providing ... remedial services at a neutral site off the premises of the nonpublic schools will not have the impermissible effect of advancing religion." Id. at 248, 97 S.Ct. at 2605. The Court rejected the claim that the use of mobile units could be perceived as "annexes" of parochial schools, even when parked off the private school property, because the units provided services only to private school students. Id. at 246-47, 97 S.Ct. at 2604-05. The Court determined that the remedial services were provided at "religiously neutral locations," and therefore, were not part of the "pervasively sectarian atmosphere of the church-related school." Id. at 247, 97 S.Ct. at 2605 (comparing Meek, 421 U.S. at 371, 95 S.Ct. at 1766). The Court anticipated that mobile units would be used for providing such services to parochial school students but did not consider the circumstances under which such units would constitute "neutral locations." Id. 433 U.S. at 247 n. 14, 97 S.Ct. at 2605 n. 14.
 
 
 18
 In Felton, the Court held that New York's practice of using Title I funds to pay the salaries of public school employees to teach parochial school students in their parochial school classrooms violated the establishment clause. 473 U.S. at 412-13, 105 S.Ct. at 3237-38. The Court ruled that the practice created excessive entanglement between church and state because the services were "provided in a pervasively sectarian environment" and because the program would require "ongoing inspection ... to ensure the absence of a religious message" from the state-provided teachers. Id. The Court instructed that after its decision, parochial school students could only receive Title I services "if such instruction ... [were] afforded at a neutral site off the premises of the religious school." Id. at 421, 105 S.Ct. at 3242 (O'Connor, J. dissenting) (quoting Aguilar v. Felton, 739 F.2d 48, 64 (2d Cir.1984)). Justice O'Connor suggested that the use of "portable classrooms just over the edge of school property" could possibly be a way of providing Title I services to parochial school children. Id. 473 U.S. at 430-31, 105 S.Ct. at 3247-48.
 
 
 19
 In a companion case, the Court held that the use of public funds to provide instructional services to private schoolchildren in classrooms located in and leased from parochial schools violated the establishment clause. School Dist. v. Ball, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985). The Court determined that the programs in issue impermissibly advanced religion in three ways. Id. at 385, 105 S.Ct. at 3223. First, because the programs were taught either by instructors otherwise employed by the parochial schools or by instructors many of whom had previously worked in parochial schools, id. at 386-87, 105 S.Ct. at 3223-24, the programs created a risk that teachers would "conform their instruction to the environment in which they teach," id. at 388, 105 S.Ct. at 3225, and indoctrinate students in religion at public expense. Id. at 388-89, 105 S.Ct. at 3225-26. Second, the programs created a "symbolic union" between the parochial school and the state because the services were actually provided in the parochial school buildings. Id. at 389-91, 105 S.Ct. at 3225-27. The Court reasoned that it was impermissible to provide the services inside the parochial schools because the parochial school "students would be unlikely to discern the crucial difference between the religious school classes and the 'public school' classes, even if the latter were successfully kept free of religious indoctrination." Id. at 391, 105 S.Ct. at 3226. Third, the programs, in reality, provided a subsidy to the "religious functions of the parochial schools by taking over a substantial portion of their responsibility for teaching secular subjects." Id. at 397, 105 S.Ct. at 3230.
 
 A.
 
 20
 We first consider the constitutionality of providing Chapter 1 services to parochial school students in mobile and portable units parked on public property.
 
 
 21
 Pulido contends that providing Chapter 1 services in mobile and portable units parked on public property adjacent to parochial schools violates both the primary effect and excessive entanglement elements of the Lemon test. The Secretary and parochial school parents argue that the Supreme Court decision in Wolman specifically approves using mobile and portable units parked on public property to provide Chapter 1 services to parochial school students.
 
 
 22
 In Wolman, a state statute authorized funding to provide therapeutic guidance and remedial services to students needing such specialized attention "in public schools, in public centers, or in mobile units located off the non-public school premises." 433 U.S. at 245, 97 S.Ct. at 2604. Employees of the local board of education provided the services under a contract with the state department of health. The Supreme Court rejected arguments that it was impermissible to isolate the sectarian pupils, and that the mobile unit "might operate merely as an annex of the school or schools it services." Id. at 246, 97 S.Ct. at 2604. The Court considered the concerns raised in Meek and concluded that the danger in that case arose from the fact that the services were provided in the "pervasively sectarian atmosphere of the church-related school," and that the danger sprang from the pressures of such an environment that might alter the public employee's behavior from his normal course. Id. at 247, 97 S.Ct. at 2605. Wolman stresses the importance of providing Chapter 1 services in "truly religiously neutral locations" to avoid the danger of the influence of the pervasively sectarian atmosphere of a religious institution. Id. Wolman states:
 
 
 23
 [W]e hold that providing therapeutic and remedial services at a neutral site off the premises of the nonpublic schools will not have the impermissible effect of advancing religion. Neither will there be any excessive entanglement arising from supervision of public employees to insure that they maintain a neutral stance. It can hardly be said that the supervision of public employees performing public functions on public property creates an excessive entanglement between church and state.
 
 
 24
 Id. at 248, 97 S.Ct. at 2605. This reasoning is fully applicable to the mobile and portable units parked on public property and provides a strong basis for affirming the district court's judgment on this issue. Analysis of other factors that apply to both units parked on public and private property further demonstrates the propriety of the district court's order upholding the constitutionality of providing Chapter 1 services in units parked on public property.
 
 B.
 
 25
 Pulido argues that providing Chapter 1 services in units parked both on and off the parochial school premises is unconstitutional because providing services in these locations has the primary effect of advancing religion and does so in three ways. First, he claims that providing Chapter 1 services in mobile and portable units impermissibly advances religion because the services are not provided in religiously neutral locations, and that the units are merely "annexes" of the parochial schools. Second, he argues that providing Chapter 1 services in units parked on the property of and adjacent to parochial schools creates a "symbolic union" between church and state. He says that the units are "physically and educationally identified with the functions of the nonpublic school," as evidenced by religious artifacts on the outside of parochial schools and the fact that most parochial schools are located "on a campus" that also includes a church, rectory, and, in some instances, a convent. Third, he argues that the services have the primary effect of advancing religion because the services are a direct aid to religion. We consider these arguments in turn.
 
 
 26
 -1-
 
 
 27
 A benefit impermissibly advances religion if the benefit flows into the hands of a pervasively sectarian institution or is channelled to a "specifically religious activity in an otherwise substantially secular setting." Hunt v. McNair, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973). As expressed in Wolman, providing remedial services to parochial schoolchildren in "truly religiously neutral locations" will not have the impermissible effect of advancing religion. 433 U.S. at 247-48, 97 S.Ct. at 2605-06. Pulido argues that the units parked on and off the premises of parochial schools are merely annexes of the parochial schools, and thus, are not "religiously neutral locations."
 
 
 28
 Here, we are convinced that the services are provided in a religiously neutral atmosphere and the units do not operate as "annexes" of the parochial schools. The mobile and portable units are separate from the parochial school buildings and classrooms. Blue Hills controls the units; parochial school personnel cannot use them for any purpose. The units consist of recreational vehicles, buses, prefabricated buildings and trailers. The units do not contain or exhibit any religious symbols. Only secular subjects--remedial reading and mathematics--are taught in the units. These facts show that the services are provided in a location that is physically and educationally separate from the functions of the parochial school, and religiously neutral. Wolman, 433 U.S. at 246-47, 97 S.Ct. at 2604-05.
 
 
 29
 Indeed, the mobility of the units does much to establish their religious neutrality and to answer Pulido's arguments that the units operate as "annexes" of the parochial schools and are physically and educationally identified with the functions of the parochial schools. A member of Blue Hills' staff drives the mobile unit to the parochial schools, and then drives the unit away once the Chapter 1 class is over. The mobile units do not remain on the parochial school property. Although one portable unit remains parked on parochial school property during the school year, it is removed during the summer. The units are only placed on the parochial school property as a last resort and are parked as far as possible from the parochial school building. "[S]afety, distance, and the adequacy of accommodations" are important factors for justifying the use of mobile classrooms "near the nonpublic school premises." Wolman, 433 U.S. at 247 n. 14, 97 S.Ct. at 2605 n. 14.
 
 
 30
 -2-
 
 
 31
 Pulido next argues that providing Chapter 1 services in units parked on the property of or near parochial schools creates a "symbolic union" between church and state. Impermissible advancement may occur when the government "fosters a close identification of its powers and responsibilities with those of any--or all--religious denominations." Ball, 473 U.S. at 389, 105 S.Ct. at 3225. "If this identification conveys a message of government endorsement or disapproval of religion," the establishment clause is violated. Id. Thus, a symbolic union may be created if the challenged governmental action "is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." Id. at 390, 105 S.Ct. at 3226.
 
 
 32
 In Ball, the Court concluded that providing instructional services to parochial schoolchildren in parochial school classrooms created a symbolic union between church and state because providing the services in the parochial school buildings threatened to convey a message of state support for religion to students and the general public. We see no such risk here when the services are provided by nonparochial school teachers in mobile and portable units that are separate and distinct from the parochial school classrooms and buildings. Cf. Ball, 473 U.S. at 375, 105 S.Ct. at 3218 (programs provided in classrooms located in and leased from private schools). The parochial school students receiving Chapter 1 services leave their classroom, go out of the doors of the parochial school buildings, and walk to the mobile or portable unit where they receive instruction from a member of the Blue Hills staff. Most of the Blue Hills' teachers are full-time, and all are hired without regard to their religious affiliation. Cf. Ball, 473 U.S. at 386, 105 S.Ct. at 3224 (noting religious background of teachers).
 
 
 33
 That the units are only temporarily placed on the parochial school property and removed (with but one exception) demonstrates that the units as well as the activities conducted inside them operate separately from the parochial schools. The fact that Blue Hills removes the units from the parochial school and public property once the Chapter 1 classes are over demonstrates the lack of a "symbolic union" between the parochial school and the government both in the eyes of the students and the public. Cf. Ball, 473 U.S. at 389-92, 105 S.Ct. at 3225-27 (state-provided instructors in the religious school buildings threaten to convey a message of state support for religion to students and to the general public). By receiving the instruction in a classroom, different from their parochial school classroom and outside of their parochial school building, and from a religiously neutral instructor who is different than their parochial school instructor, the children should "discern the crucial difference between the religious school classes and the 'public school' classes." Ball, 473 U.S. at 391, 105 S.Ct. at 3226.
 
 
 34
 -3-
 
 
 35
 Pulido also contends that the use of the mobile and portable units, both on and off the property of the parochial schools, results in government aid to religion and thus has the primary effect of advancing religion. Pulido contends that a direct aid to religion is shown by the facts that: (1) the religious schools rather than the students themselves decide whether the students will participate in the program; (2) the location of the units is determined by the location of religious schools rather than where the low-income families live; (3) the units serve only religious students; (4) Chapter 1 classes occur during the school day; and (5) the use of such units breeds "political conflict" because the units serve only religious students.
 
 
 36
 These facts do not add up to describe a program that has the primary effect of advancing religion. The program provided to the parochial school students is not different from the program provided to public school students and does not accommodate the religious views of the parochial schools. Cf. Parents' Ass'n of P.S. 16 v. Quinones, 803 F.2d 1235, 1241 (2d Cir.1986) (providing remedial education for female Hasidic Jews in part of a public school building, which would be closed off to other students, and taught in Yiddish by female teachers would have the primary effect of promoting Hasidic religion); Bollenbach v. Bd. of Ed., 659 F.Supp. 1450, 1464 (S.D.N.Y.1987) (deploying only male bus drivers on bus routes would have the primary effect of advancing Hasidic religion). Both private and public school students are eligible for Chapter 1 services if they are educationally deprived and reside in a qualifying low income area. See 20 U.S.C. Sec. 2724; 34 C.F.R. Sec. 200.50 (1990). The Supreme Court has stated that the fact that the remedial services are provided only to religious school students does not mean that the services impermissibly advance religion or breed political conflict as long as the services are provided at a "neutral site." Wolman, 433 U.S. at 247-48, 97 S.Ct. at 2605-06 (danger that a public employee might be unduly influenced by sectarian atmosphere "arose from the nature of the institution, not from the nature of the pupils.") Moreover, that Chapter 1 classes occur during the school day is only evidence that the parochial school students receive "comparable services," Wheeler, 402 U.S. at 419, 94 S.Ct. at 2284, to those afforded public school students. Finally, "political divisiveness alone" cannot invalidate otherwise permissible conduct. Lynch v. Donnelly, 465 U.S. 668, 684, 104 S.Ct. 1355, 1365, 79 L.Ed.2d 604 (1984). See also Bowen, 487 U.S. at 617 n. 14, 108 S.Ct. at 2578 n. 14 ("question of 'political divisiveness' should be regarded as confined to cases where direct financial subsidies are paid to parochial schools or to teachers in parochial schools") (quoting Mueller v. Allen, 463 U.S. 388, 404 n. 11, 103 S.Ct. 3062, 3071 n. 11, 77 L.Ed.2d 721 (1983) (emphasis added)).
 
 
 37
 Accordingly, we are convinced that providing Chapter 1 services in mobile and portable units does not have the primary effect of advancing religion.
 
 C.
 
 38
 Pulido next argues that providing Chapter 1 services in units on the property of or near parochial schools results in excessive government entanglement between church and state. Specifically, Pulido complains that there is "extensive daily contact" between the parochial and the Blue Hills' staffs. Pulido points to evidence that the staffs discuss various subjects, including the skills taught in the parochial and Chapter 1 classrooms, scheduling of the Chapter 1 program, and the progress and eligibility of students for the Chapter 1 program. Pulido complains that these contacts amount to excessive entanglement in violation of the establishment clause.
 
 
 39
 In Felton, the Supreme Court ruled that providing Chapter 1 services inside parochial school buildings created excessive entanglement between the church and the state. 473 U.S. at 414, 105 S.Ct. at 3238. The Court found that excessive entanglement existed because the services were "provided in a pervasively sectarian environment," and because "ongoing inspection [was] required to ensure the absence of a religious message" from the state-provided teachers. Id. at 412, 105 S.Ct. at 3237. The Court held that such a "detailed monitoring and close administrative contact" constituted excessive entanglement. Id. at 414, 105 S.Ct. at 3239. See also Meek, 421 U.S. at 352-53, 95 S.Ct. at 1756-57 (a comprehensive system of supervision between the parochial and public school staffs may lead to unconstitutional entanglement).
 
 
 40
 The Supreme Court has also recognized that some amount of entanglement between church and state is tolerable under the first amendment. See Bowen v. Kendrick, 487 U.S. 589, 615-17, 108 S.Ct. 2562, 2577-79, 101 L.Ed.2d 520 (1988). Indeed, "some involvement and entanglement are inevitable." Lemon, 403 U.S. at 625, 91 S.Ct. at 2117. See also Walz v. Tax Comm'n, 397 U.S. 664, 676, 90 S.Ct. 1409, 1415, 25 L.Ed.2d 697 (1970) ("[T]he complexities of modern life inevitably produce some contact" between government and religious institutions); Lynch, 465 U.S. at 673, 104 S.Ct. at 1359 ("No significant segment of our society and no institution within it can exist in a vacuum or in total or absolute isolation from all the other parts, much less from government.") We are satisfied that the contact between the Blue Hills' and parochial school staffs does not rise to the level of excessive entanglement.
 
 
 41
 This court has already held that the services are provided in religiously neutral locations. Cf. Felton, 473 U.S. at 412, 105 S.Ct. at 3238 (services provided in same religious school classroom). Moreover, the interaction between the parochial and Blue Hills staffs is not like that found in Felton, 473 U.S. at 413, 105 S.Ct. at 3238 (parochial schools need not "endure the ongoing presence of state personnel whose primary purpose is to monitor teachers and students in an attempt to guard against the infiltration of religious thought.") Indeed, the district court concluded that the "Title I program could not exist if the teachers who have primary authority over the parochial school students were not allowed to confer with [Blue Hills] over issues such as scheduling of Title I services and discipline problems." Pulido, 728 F.Supp. at 593.
 
 
 42
 No evidence exists that the parochial and Blue Hills staffs engaged in any religious discussions. Id. at 593. Nor does the fact that the units are parked on or adjacent to the parochial school property create a risk that improper activities would occur. Cf. Ball, 473 U.S. at 387, 105 S.Ct. at 3225 (there is a substantial risk that the religious message that the parochial school teachers are expected to convey during the regular school day will infuse the supposedly secular classes they teach after school). We are satisfied that every effort has been made to ensure that no entanglement occurs between the staffs. Blue Hills supervisory staff monitor all aspects of the Chapter 1 program and regularly visit the mobile and portable units and the leased space. Blue Hills does not monitor or inspect the private schools, and likewise, the private schools do not monitor or supervise the Chapter 1 program. We are satisfied that there is no excessive entanglement between the church and state. See Wolman, 433 U.S. at 248, 97 S.Ct. at 2605; See also Bowen, 487 U.S. at 615-16, 108 S.Ct. at 2577-78.
 
 D.
 
 43
 It is apparent that the most troublesome problem before us is the use of the mobile and portable units parked on parochial school property. What we have said above in Parts I.B. and I.C. applies equally to these mobile and portable units. The district court drew the constitutional line based on the fact that the mobile and portable units were parked on parochial school property rather than on the immediately adjacent public property. The difficulty of the issue is illustrated by the fact that some of the units parked on the church property are farther from the doors of the school buildings than some of the units that are parked on the public property.
 
 
 44
 Pulido notes that the Supreme Court in Wolman and the district court in Wamble used the term "premises" to describe the area that could or could not qualify as "religiously neutral." Wolman, 433 U.S. at 248, 97 S.Ct. at 2605 ("providing therapeutic and remedial services at a neutral site off the premises of the nonpublic schools will not have the impermissible effect of advancing religion"); Wamble, 598 F.Supp. at 1372 ("religious neutrality cannot exist on the premises" of parochial schools). Pulido points out that the term "premises" includes land surrounding the parochial school building owned by the religious institution. Pulido also notes that Justice O'Connor in her Felton dissent suggested that the portable classrooms must be just over the edge of the parochial school property to pass constitutional muster. Felton, 473 U.S. at 430-31, 105 S.Ct. at 3247-48 (O'Connor, J., dissenting). From these statements, Pulido argues that providing Chapter 1 services on land owned by religious institutions impermissibly advances religion.
 
 
 45
 Pulido makes too fine an argument based on the word "premises." We believe that the location of the mobile and portable units is an important, although not a determinative, factor in deciding whether the method of providing Chapter 1 services impermissibly advances religion. Furthermore, we do not believe that dictum by Justice O'Connor compels a holding that Chapter 1 services must be provided in units that are parked off the property of the religious institution. The Supreme Court has not considered the constitutionality of providing Chapter 1 services in mobile and portable units parked on the premises of parochial schools. Indeed, the language in the numerous decisions of the Supreme Court using the word "premises" considers the constitutionality of providing services in classrooms located off the parochial school property, Wolman, 433 U.S. at 245, 97 S.Ct. at 2604, or considers providing the services in parochial school buildings. Felton, 473 U.S. at 406, 105 S.Ct. at 3234 (services provided in parochial school classrooms); Ball, 473 U.S. at 375, 105 S.Ct. at 3218 (services provided in classrooms located in and leased from parochial schools). Even Wolman, in its discussion of Meek, refers to providing services "in schools," 433 U.S. at 243, 97 S.Ct. at 2603 (emphasis added), and "in the pervasively sectarian atmosphere of the church-related school." 433 U.S. at 247, 97 S.Ct. at 2605 (emphasis added).
 
 
 46
 We are convinced that the Supreme Court's concern with providing Chapter 1 services on parochial school premises has focused on the problem of providing the services in parochial school classrooms within a pervasively sectarian school building. Constitutional concerns necessarily arise when the state-sponsored activity occurs within the religious schools, because one of the primary purposes of religious schools is the "inculcation of religious values." Felton, 473 U.S. at 411, 105 S.Ct. at 3237; see also Meek, 421 U.S. at 366, 95 S.Ct. at 1763 ("The very purpose of many of those schools is to provide an integrated secular and religious education"). Once the classroom facility becomes mobile and is outside the school building door, we begin to deal with fine gradations. Here, Blue Hills parks the units outside the parochial school buildings. The units display no religious symbols. Blue Hills controls the units. The units are staffed and operated with public funds for the purpose of providing remedial programs to educationally deprived children. The programs are the same or similar to those provided in public schools. For these reasons, we cannot conclude that the programs impermissibly advance religion or result in excessive entanglement. Legal title to the real estate alone should not dictate a contrary result.
 
 
 47
 The use of the mobile and portable units to provide Chapter 1 services is a "practical response to the logistical difficulties of extending needed and desired aid to all children of the community." Wolman, 433 U.S. at 247 n. 14, 97 S.Ct. at 2605 n. 14. The Supreme Court has clearly held that parochial school students may receive Chapter 1 services, that these students are entitled to receive "comparable services," and that these services cannot be provided in parochial school classrooms. Pulido puts forth no feasible alternative for providing "comparable" Chapter 1 services to parochial school students in Missouri. Indeed, the district court considered the possibility of requiring Blue Hills to park all units one or two blocks away from the schools, but the lack of restroom facilities made this requirement impractical.[4] Pulido, 728 F.Supp. at 593 n. 30.
 
 
 48
 The district court perceptively commented on the difficulty of drawing fine lines and the particular gradations that result when providing Chapter 1 services to parochial school students.[5] We are also aware of the difficulty in drawing fine lines, but our reading of the Supreme Court teachings convinces us that it is permissible to provide Chapter 1 services to parochial schoolchildren in mobile and portable units parked on parochial school property as well as on adjacent public property. Thus, we affirm the district court's ruling that the use of mobile and portable units off the premises of parochial school property is constitutional, but reverse the district court's ruling that the use of such units on the parochial school property is unconstitutional.
 
 II.
 
 49
 Pulido challenges the Department of Education's decision to take both the costs involved in administering the bypass and the costs incurred as a result of Felton off the top of Missouri's Chapter 1 fund allocation. "Bypass costs" consist primarily of the costs of carrying out the bypass and in this case, primarily the costs paid to Blue Hills to carry out the contract. "Felton costs" are the costs incurred in providing Chapter 1 services outside parochial school buildings and include such expenses as the costs of leasing mobile and portable units and other space, and the costs of transporting students to Chapter 1 sites. The issues here arise because Chapter 1 services are provided to public school students by the local educational agencies. The Secretary and each state must budget and allocate the cost of providing Chapter 1 services to both parochial and public school students.
 
 
 50
 Pulido contends that taking bypass and Felton costs off the top violates the establishment clause because: (1) the government allocation induces political divisiveness and invites annual competition for Chapter 1 funds by public and parochial schools; and (2) results in compelling federal taxpayers and public school students to bear part of the extra expense incurred in providing Chapter 1 programs for parochial school students. Pulido also contends that the off-the-top formula violates the provisions of 20 U.S.C. Sec. 2727(a),[6] which requires "equal" expenditures for parochial and public school students.[7]
 
 
 51
 The district court concluded that taking administrative bypass costs off the top was constitutional. Pulido, 728 F.Supp. at 586. The court went on, however, to hold that taking Felton costs off the top was unconstitutional. Id. at 586-87. The court reached this conclusion by comparing the per-pupil expenditures between parochial and public school students, taking into account both bypass and Felton costs. Id. at 581. The court concluded that although the disparity in the per-pupil expenditures as a result of Felton alone might "not cause [it] much concern," 728 F.Supp. at 586,[8] when coupled with the 1988 capital expense provision authorized by 20 U.S.C. Sec. 2727(d)(3)[9] (1988), the off-the-top allocation conferred a direct benefit to parochial schools. Id. at 587. 20 U.S.C. Sec. 2727(d)(3) authorized the appropriation of $30 million in 1988, $40 million in 1989 and "such sums as may be necessary" through 1993, for capital expenses,[10] "when without such funds, services to private schoolchildren would ... [be] reduced or adversely affected." The district court reasoned that in light of this authorization for expenditure of funds, taking Felton costs off the top had the primary effect of establishing religion because it took federal funds from public school students to allow the services to be provided to parochial school students, and because it impermissibly subsidized "the primary religious mission of the institutions affected." 728 F.Supp. at 587 (quoting Ball, 473 U.S. at 385, 105 S.Ct. at 3223).
 
 
 52
 We first observe that the district court's consideration of the authorization of appropriation of funds for bypass expenses by Congress arose in this case sua sponte. We are concerned that the district court has, in essence, held the operation of a statute in conjunction with the off-the-top allocation of Felton costs unconstitutional when the parties did not raise this argument. Furthermore, we are troubled by the fact that the court may have impermissibly issued an advisory opinion as the district court does not enjoin application of the statute. See Michigan v. Long, 463 U.S. 1032, 1040-41, 103 S.Ct. 3469, 3476-77, 77 L.Ed.2d 1201 (1983). Despite these concerns, we will consider the district court's holding as the parties have fully briefed the substantive issues on appeal. We are convinced that the district court erred in holding the off-the-top allocation unconstitutional by comparing per-pupil expenditures and considering the constitutionality of the off-the-top allocation in conjunction with the capital expense provision of 20 U.S.C. Sec. 2727(d)(3).
 
 
 53
 As the district court recognized, a statute is not unconstitutional simply because it spends more money on parochial school students than it does on public school students. Pulido, 728 F.Supp. at 585-86. The Supreme Court has expressly required that public and private school students receive "comparable" services. Wheeler, 417 U.S. at 421, 94 S.Ct. at 2285 (emphasis added). See also 34 C.F.R. Sec. 200.50 (requiring participation on an "equitable basis"). In providing comparable services, the Supreme Court has not required absolute equality of expenditure between public and private school students. Indeed, the Court has recognized that some differences might permissibly result--noting that "comparable services" does not mean "identical" services, Wheeler, 417 U.S. at 421-22, 94 S.Ct. at 2285-86, or "any particular form of service." Id. at 428, 94 S.Ct. at 2288. This court has also recognized that the cost of providing comparable services might well result in more money being spent on parochial school students than public school students. Barrera v. Wheeler, 531 F.2d 402, 406-07 (8th Cir.1976).
 
 
 54
 The Supreme Court has rejected the claim that a statute is unconstitutional merely because a greater overall financial benefit accrues to parochial schools or their students than to public schools or their students. In Mueller v. Allen, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), the Supreme Court affirmed this circuit's decision upholding a state statute that granted parents a tax deduction for amounts spent on their children's tuition, textbooks, and transportation despite the fact that the overwhelming majority of the resulting financial benefit went to parents of parochial school students. Id. at 400-02, 103 S.Ct. at 3069-71. The Court did not consider the disparity important because the benefit was available to "all parents"--whether their children attended public or private schools. Id. at 397, 103 S.Ct. at 3068 (emphasis in original). Although Mueller considered a benefit in the form of a tax deduction, a majority of the Court in Witters v. Washington Dep't of Services for the Blind, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), emphasized that the same principle applied to the direct funding of scholarships. Id. at 490-93, 106 S.Ct. at 753-55 (program not unconstitutional because a majority of benefits happen to accrue to religiously-affiliated individuals) (Powell, J., concurring); (joined by Burger, C.J., and Rehnquist, J.); id. at 493, 106 S.Ct. at 755 (O'Connor, J., concurring). See also Bowen, 487 U.S. at 609, 108 S.Ct. at 2574 ("[W]e have found it important that the aid is made available regardless of whether it will ultimately flow to a secular or sectarian institution"); Everson v. Bd. of Ed., 330 U.S. 1, 17, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1946) (State may constitutionally spend "tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools.")
 
 
 55
 The district court did not consider Mueller or Witters in striking down the Secretary's off-the-top allocation. Instead, it relied on several district and circuit court decisions and considered whether a disparity in amounts spent on public and private school students amounted to an unconstitutional establishment of religion. Pulido, 728 F.Supp. at 585-86 (citing Cromwell Property Owners Ass'n v. Tollofon, 495 F.Supp. 915, 923 (D.Conn.1979); Member of Jamestown School Comm. v. Schmidt, 699 F.2d 1, 10 (1st Cir.), cert. denied, 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983); Bollenbach v. Bd. of Ed., 659 F.Supp. 1450, 1461 (S.D.N.Y.1987); Bennett v. Kline, 486 F.Supp. 36, 39 (E.D.Pa.), aff'd, 633 F.2d 209 (3d Cir.1980)). The district court compared per-pupil expenditures and concluded that the cost of providing Chapter 1 services to the parochial school student was "grossly disproportionate" to the cost of providing services to the public school student. For this reason, the court held that the off-the-top allocation of Felton costs conferred a " 'direct' benefit" to parochial schools. 728 F.Supp. at 586-87.
 
 
 56
 The district court's comparison of per-pupil expenditures is the type of comparison that the Supreme Court cautioned against in Mueller. There, the Court specifically declined to consider statistics comparing the financial benefits accruing to parents of parochial and public school students: "We would be loath to adopt a rule grounding the constitutionality of a facially neutral law on annual reports reciting the extent to which various classes of private citizens claimed benefits under the law." 463 U.S. at 401, 103 S.Ct. at 3070.
 
 
 57
 Here, the facial neutrality of the Chapter 1 program is unquestioned. See Wolman, 433 U.S. at 236, 97 S.Ct. at 2599 (challenged statute reflects state's "legitimate interest in ... providing a fertile educational environment for all the schoolchildren of the State"); Ball, 473 U.S. at 383, 105 S.Ct. at 3221 (education of children is a secular purpose). Accordingly, we believe that the district court erred in striking down the off-the-top allocation based on a comparison of the costs of providing the services to parochial and public school students.
 
 
 58
 Moreover, we believe that the district court erred when it considered the off-the-top allocation of Felton costs in conjunction with the capital expense provision of 20 U.S.C. Sec. 2727(d)(3). Contrary to the holding of the district court, we are satisfied that Congress' authorization for the appropriation of funds for capital expenditures is not a mechanism used to increase the number of parochial schoolchildren receiving Chapter 1 services. Both private and public school students benefit from the capital expense provision of 20 U.S.C. Sec. 2727(d)(3). The regulations provide that a local educational agency "... shall use payments received under [the capital expenses provision] ... [t]o provide Chapter 1 services to benefit, to the extent possible, the public and private school children who were or are adversely affected by the [local educational agency's] expenditures for capital expenses." 34 C.F.R. Sec. 200.58(a)(1) (emphasis added). Funds provided under section 2727(d) are placed in the overall Chapter 1 allocation for all Chapter 1 students. See Mueller, 463 U.S. at 397, 103 S.Ct. at 3068 (parents of both public and parochial school students are entitled to tax deduction); cf. Committee for Pub. Ed. v. Nyquist, 413 U.S. 756, 780-89, 93 S.Ct. 2955, 2969-74, 37 L.Ed.2d 948 (1973) (tuition grants flowing solely to parents of nonpublic school students violated establishment clause).
 
 
 59
 We are satisfied that the allocation of bypass and Felton costs does not subsidize parochial schools. The Secretary's regulations require that Chapter 1 funds be used "to provide services that supplement, and in no case supplant, the level of services that would, in the absence of Chapter 1 services, be available to participating children in private schools." 34 C.F.R. Sec. 200.53(a). Cf. Ball, 473 U.S. at 397, 105 S.Ct. at 3229 ("programs in effect subsidize the religious functions of the parochial schools by taking over a substantial portion of their responsibility for teaching secular subjects"). Chapter 1 funds cannot be used for "[t]he needs of the private school" or "[t]he general needs of children in the private school." 34 C.F.R. Sec. 200.53(b)(1) and (2).
 
 
 60
 Further, the off-the-top allocation of Felton and bypass costs neither "takes" from one group and "gives" to another nor invites competition for funds between public and parochial schools. Rather, the allocation simply meets the expenses of providing Chapter 1 services to parochial school students. The Department of Education determines the state's allocation of Chapter 1 funds based on a statutory formula. 20 U.S.C. Sec. 2711. When a bypass is in place, the Department of Education withholds from the state's allocation the amount necessary to provide services under the bypass, 20 U.S.C. Sec. 2727(b)(3)(C),[11] and deducts those costs from the state's entire Chapter 1 allocation. 20 U.S.C. Sec. 2727(b)(3)(B).[12] For example, Blue Hills designs a Chapter 1 program for the private schools based on information received from the local educational agency and the program provided to public schoolchildren. Blue Hills prepares a budget for that program, and submits it to the local educational agency. The approved budget amount is withheld from the state's total allocation. Although it may cost more to provide Chapter 1 services to parochial school students, the additional cost is required to give those students "comparable services." The off-the-top allocation is simply a response to the dilemma created after the Supreme Court's decision in Felton, prohibiting the government from providing Chapter 1 services in parochial school buildings, but requiring the government to provide parochial schoolchildren "comparable services." The allocation does not have the primary effect of advancing religion.
 
 
 61
 Pulido argues that the off-the-top allocation is unconstitutional because it requires federal taxpayers to fund the expenses incurred in providing a constitutionally permissible Chapter 1 program, and that such a burden is unconstitutional under the teachings of Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985), and Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). In Caldor, the Supreme Court ruled that a Connecticut statute that guaranteed all workers their sabbath off violated the establishment clause. Id. 472 U.S. at 708-10, 105 S.Ct. at 2917-18. Similarly, the Supreme Court in Hardison held that requiring employers or other employees to bear more than a de minimis burden in accommodating an employee's religious practice would discriminate on the basis of religion. Id. at 84, 97 S.Ct. at 2276. Pulido also argues that the off-the-top allocation is, in reality, an impermissible subsidy to accommodate students attending parochial schools, and is therefore, unconstitutional under Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 109 S.Ct. 890, 899-901, 103 L.Ed.2d 1 (1989) (state sales tax exemption for religious periodicals unconstitutional because it benefited only religious periodicals).
 
 
 62
 Caldor, Hardison, and Bullock do not control here. In Caldor, the Court stressed that the state could not "compel people to act in the name of any religion." 472 U.S. at 708, 105 S.Ct. at 2917. It struck down the statute because it imposed a duty on employers and employees "to conform their business practices to the particular religious practices of the employee." Id. at 709, 105 S.Ct. at 2917. Likewise, the Court in Hardison refused to require an employer to give an employee his sabbath off because such a requirement would result in unequal treatment of employees on the basis of religion. 432 U.S. at 84, 97 S.Ct. at 2276. Here, the Chapter 1 allocation of funds does not impose a duty on a group of individuals to change their practices to accommodate religion or "compel people to act in the name of [a] religion." Cf. Caldor, 472 U.S. at 708, 105 S.Ct. at 2917. Nor does the allocation of bypass and Felton costs promote a single religion or religion generally. See Ball, 473 U.S. at 382, 105 S.Ct. at 3220; McNair, 413 U.S. at 743, 93 S.Ct. at 2874. Finally, the allocation does not result in public and parochial students receiving unequal treatment. Wheeler, 417 U.S. at 419, 94 S.Ct. at 2284 (parochial school students must be provided "comparable services"); cf. Bullock, 109 S.Ct. at 899-900 (exemption benefited only religious periodicals). To the contrary, the method of allocation ensures that public and parochial school students will receive "comparable services," a goal which the Supreme Court has endorsed and required.
 
 
 63
 Accordingly, we affirm the district court's judgment that taking bypass costs off the top of a state's Chapter 1 allocation is constitutional, but reverse the judgment that taking Felton costs off the top of a state's Chapter 1 allocation is unconstitutional.
 
 III.
 
 64
 We affirm the district court's holdings that the use of mobile and portable classroom units to provide Chapter 1 services on public property and the method of allocating bypass costs are constitutional. We reverse the district court's rulings that providing such services in units parked on the parochial school property and the method of allocating Felton costs are unconstitutional.
 
 
 65
 BEAM, Circuit Judge, concurring and dissenting.
 
 
 66
 I fully concur in part II of the panel opinion. I respectfully dissent as to part I.
 
 
 67
 I begin my partial dissent with the observation that Supreme Court jurisprudence with regard to the interplay between the free speech, establishment, and free exercise clauses of the first amendment[13] is somewhat incongruous and definitely difficult to apply to diverse interests. The first amendment by word or history does not require an absolute separation of church and state. Yet the quest for such separation, although, in practice, impossible, seems always to be the goal, a goal which is never achieved. In this context, I advance my legal conclusions in this case.
 
 
 68
 The Supreme Court has said that classrooms in which we educate sectarian students with public funds must be located at a "neutral site off the premises of the nonpublic schools." Wolman v. Walter, 433 U.S. 229, 248, 97 S.Ct. 2593, 2605, 53 L.Ed.2d 714 (1977). Clearly, then, the positioning of mobile classrooms on private school premises[14] does not pass constitutional muster under Supreme Court standards. Classrooms placed at the curb of a public street a few steps from the door of the church-related school are no less offensive, constitutionally speaking. Wolman stresses the need for a "neutral site." Id. at 248, 97 S.Ct. at 2605. The "off the premises" language is, in my view, secondary. It is clear that the Supreme Court finds no location on church grounds acceptable. It is equally clear that a classroom in a religious setting "off the premises of the nonpublic" school is also unacceptable. I would, accordingly, find, in keeping with Supreme Court mandates, that use of classrooms at the locations set forth in this case, at the curb or on the premises, violates the Constitution.
 
 
 
 [1]
 Hereafter, we will refer to these individuals as Pulido
 
 
 [2]
 In 1981, Congress enacted Chapter 1 of the Education Consolidation and Improvement Act, 20 U.S.C. Secs. 2701-3386 (1982). This Act was a continuation of Title I of the Elementary and Secondary Education Act of 1965, and authorizes funding of remedial educational services to students in certain low income areas. 20 U.S.C. Sec. 2701 (and Prior Provisions note)
 
 
 [3]
 Pulido does not appeal this ruling. The history of the litigation surrounding the bypass is well documented in Wamble v. Bell, 598 F.Supp. at 1358-65
 
 
 [4]
 The dissent might find such to be the only possible solution
 
 
 [5]
 The "fine gradations" present here are further demonstrated by testimony that in 1986, six of the thirteen units parked on private school property were located directly or partly on public easements
 
 
 [6]
 20 U.S.C. Sec. 2727(a) provides in part:
 Expenditures for educational services and arrangements pursuant to this section for educationally deprived children in private schools shall be equal (taking into account the number of children to be served and the special educational needs of such children) to expenditures for children enrolled in the public schools of the local educational agency.
 
 
 [7]
 The district court held that the federal taxpayers lacked standing to challenge whether the Secretary's allocation violated 20 U.S.C. Sec. 2727(a). Pulido, 728 F.Supp. at 576 n. 3. Although Pulido continues to assert that the allocation violates the statute, Pulido does not attack the district court's ruling. We affirm the district court's holding that federal taxpayers lack standing to make this challenge because the allocation is an executive action. See Bowen, 487 U.S. at 618-20
 
 
 [8]
 The parties provided differing figures as to the amount of disparity between the per-pupil cost of providing Chapter 1 services to parochial and public school students caused by Felton. Pulido, 728 F.Supp. at 586
 
 
 [9]
 20 U.S.C. Sec. 2727(d)(3) provides:
 There is authorized to be appropriated $30,000,000 for fiscal year 1988, $40,000,000 for the fiscal year 1989, and such sums as may be necessary for each of the fiscal years 1990, 1991, 1992, and 1993. Any sums appropriated under this provision shall be used for increases in capital expenses paid from funds under chapter 1 of the Education Consolidation and Improvement Act or this section subsequent to July 1, 1985, of local educational agencies in providing the instructional services required under section 557 of the Education Consolidation and Improvement Act and this section, when without such funds, services to provide schoolchildren would have been or have been reduced or would be reduced or adversely affected.
 
 
 [10]
 "Capital expenses" are defined as "expenditures for non-instructional goods and services such as the purchase, lease and renovation of real and personal property (including but not limited to mobile educational units and leasing of neutral sites or space), insurance and maintenance costs, transportation, and other comparable goods and services." 20 U.S.C. Sec. 2727(d)(4)
 
 
 [11]
 20 U.S.C. Sec. 2727(b)(3)(C) provides:
 Pending final resolution of any investigation or complaint that could result in a determination under this subsection, the Secretary may withhold from the allocation of the affected State or local educational agency the amount the Secretary estimates would be necessary to pay the cost of such services.
 
 
 [12]
 20 U.S.C. Sec. 2727(b)(3)(B) provides:
 When the Secretary arranges for services pursuant to this subsection, the Secretary shall, after consultation with the appropriate public and private school officials, pay to the provider the cost of such services, including the administrative cost of arranging for such services, from the appropriate allocation or allocations under this division.
 
 
 [13]
 "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech...." U.S. Const. amend I
 
 
 [14]
 There is little ambiguity occasioned by the Supreme Court's use of the word premises. To divide a location into buildings and grounds proves little since, as argued by Pulido, many if not most private religious schools are part of a larger tract of land upon which a church, a rectory, a convent, outdoor statuary, and other religious objects are frequently located. They are part of the ambiance of the "premises" and repel the idea that a "neutral site" can be provided anywhere on such real estate