Albert C. WALKER; Roberta M. Walker; John C. Soso; Jacklyn C. Soso; Margaret Smith; Alyce Crosdale; Betty Sands, Plaintiffs–Appellees,

v.

SAN FRANCISCO UNIFIED SCHOOL DISTRICT, Defendant,

and

United States Department of Education; Lamar Alexander, in his official capacity as Secretary of Education, Defendants–Intervenors–Appellants.

Albert C. WALKER; Roberta M. Walker; John C. Soso; Jacklyn C. Soso; Margaret Smith; Alyce Crosdale; Betty Sands, Plaintiffs–Appellees,

v.

BOARD OF EDUCATION OF the SAN FRANCISCO UNIFIED SCHOOL DISTRICT, CITY AND COUNTY OF SAN FRANCISCO, STATE OF CALIFORNIA; Ramon Cortines, Superintendent of Schools, San Francisco Unified School District; San Francisco Unified School District, Defendants–Appellants.

Albert C. WALKER; Roberta M. Walker; John C. Soso; Jacklyn C. Soso; Margaret Smith; Alyce Crosdale; Betty Sands, Plaintiffs–Appellees,

v.

SAN FRANCISCO UNIFIED SCHOOL DISTRICT, CITY AND COUNTY OF SAN FRANCISCO, STATE OF CALIFORNIA, Defendant,

and

Deborah Martin; Jacob Perea; Barbara Perea, Defendants–Intervenors–Appellants.

Albert C. WALKER; Roberta M. Walker; John C. Soso; Jacklyn C. Soso; Margaret Smith; Alyce Crosdale; Betty Sands, Plaintiffs–Appellees,

v.

William HONIG, as California Superintendent of Public Instruction; California Department of Education; California State Board of Education, Defendants–Appellants,

and

San Francisco Unified School District, Defendant.

Albert C. WALKER; Roberta M. Walker; John C. Soso; Jacklyn C. Soso; Margaret Smith; Alyce Crosdale; Betty Sands, Plaintiffs–Appellants,

v.

BOARD OF EDUCATION OF the SAN FRANCISCO UNIFIED SCHOOL DISTRICT; San Francisco Unified School District, City and County of San Francisco, State of California; Ramon Cortines, Superintendent of Schools, San Francisco Unified School District, Defendants–Appellees,

United States Department of Education; Deborah Martin; Lamar Alexander, in his official capacity as Secretary of Education; Jacob Perea; Barbara Perea, Defendants–Intervenors–Appellees.

Nos. 92–15977, 92–15979, 92–15982, 92–15983 and 92–15985.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 4, 1993.

Decided Jan. 30, 1995.

Lee Boothby, Washington, DC, for plaintiffs-appellees-appellants.

Kevin T. Baine, Williams & Connolly, Washington, DC, for defendants-intervenors-appellants-cross-appellees, Perea, Martin.

Jonathan R. Siegel (argued) Howard S. Scher (on the briefs), U.S. Dept. of Justice, Washington, DC, for defendant-intervenor-appellant-appellee, Dept. of Ed.

Before: TANG, TROTT, and FERNANDEZ, Circuit Judges.

Opinion by Judge TANG; Partial Concurrence and Partial Dissent by Judge FERNANDEZ.

TANG, Senior Circuit Judge:

This appeal involves the provision of public educational services to parochial school students under Chapters 1 and 2 of the Education Consolidation and Improvement Act of 1981 (ECIA), as amended 20 U.S.C. § 2701, *et seq.* (1988).[1]

In 1985, the Supreme Court held that public school districts violated the Establishment Clause by providing Chapter 1 remedial educational services in parochial school classrooms. *Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985). In response, school districts across the country, including the San Francisco Unified School District (the District), began providing remedial classes to parochial school students via "mobile classrooms" and computer-aided instruction.[2]

We are called upon to decide whether temporarily parking these mobile classrooms on parochial school property, and whether certain aspects of administering and funding the Chapter 1 program, violate the Establish-

---

1. Chapters 1 and 2 were reauthorized by Title I of the Augustus F. Hawkins–Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988, P.L. 100–297, 102 Stat. 130 (1988). The statutory provisions regarding participation of private school children remained the same. *Compare* 20 U.S.C. § 3806 (1982) (Chapter 1), *with* 20 U.S.C. § 2727 (1988) (Title I); 20 U.S.C. § 3811 (Chapter 2) (1982), *with* 20 U.S.C. § 2972 (Title I). *See also Aguilar v. Fel-*

*ton,* 473 U.S. 402, 404 n. 1, 105 S.Ct. 3232, 3234 n. 1, 87 L.Ed.2d 290 (1985) (discussing programs' earlier history). For ease of reference, we will refer to the programs as Chapters 1 and 2.

2. The computer-aided instruction is not challenged.

ment Clause. We must also determine whether providing educational equipment and materials to parochial schools under Chapter 2 is constitutional.

## BACKGROUND

### I. *Chapter 1 Services*

Chapter 1 provides financial assistance to state and local educational agencies to meet the special needs of "educationally deprived" children residing in low-income areas. *See* 20 U.S.C. § 2701; 34 C.F.R. § 200.31. Local educational agencies (LEAs) administering the program must provide for the participation of public and private school students on an "equitable" basis,[3] and the expenditures for educationally deprived children in each setting must be equal. *See* 20 U.S.C. 2727(a); 34 C.F.R. §§ 200.50, 200.52. An LEA is required to consult with private school officials regarding the provision of Chapter 1 services to those students. *See* 20 U.S.C. § 2727(a); 34 C.F.R. 200.51. If an LEA is prohibited by law from providing Chapter 1 services to private school children, or if the Secretary of the Department of Education (Secretary) determines that an LEA has not provided equitable services, the private school may obtain a "bypass" and receive services through an alternative provider. *See* 20 U.S.C. § 2727(b); 34 C.F.R. § 200.60. Expenses for the bypass, and other administrative expenses involved in providing services to private school students, are treated as capital expenses and taken "off-the-top" of the Chapter 1 budget; i.e., these expenses are deducted from the LEA's budget before the allocation of funds between public and private students. *See* 34 C.F.R. § 200.52(a)(2).

Regulations require that services to private school students be provided by employees of a public agency or through contract with a provider independent of the private school or any religious organization. *See* 34 C.F.R. § 200.50(a)(4)(i). An LEA must keep title to and exercise administrative control over Chapter 1 funds and property. *See* 34

C.F.R. §§ 200.50(a)(3), 200.54(a). Further, an LEA cannot provide services that would supplant the level of services that would otherwise be available to private school children absent Chapter 1 services, and an LEA cannot use funds to meet the needs of the school or the general needs of children in the private school. *See* 34 C.F.R. § 200.53.

Prior to the Supreme Court's decision in *Aguilar*, the District provided Chapter 1 remedial services in private (including parochial) school classrooms. In response to *Aguilar*, the District began providing remedial classes to parochial school students via "mobile classrooms"; i.e., vans equipped as classrooms which can be moved from site to site.

Sixteen parochial schools in the school district receive Chapter 1 services through the use of mobile classrooms. It is the District's policy to park on public property, or on private property not affiliated with any religious institution. In four instances, however, the District parks the vans on parochial school grounds due to safety concerns arising from narrow streets and the difficulty of emergency vehicle access, excessive pedestrian and vehicular traffic, or high levels of street crime.

Plaintiffs challenge the District's practice of temporarily parking these mobile classrooms on parochial school property. The district court agreed that this practice violates the Establishment Clause because of the "symbolic union" it creates between church and state. This conclusion is appealed by the United States Department of Education (DOE), the District, the California Department of Education, and parents of parochial school children (intervenors).

The Plaintiffs also argue that the extent of administrative contact between public and private school officials creates excessive entanglement between church and state. The district court held that some amount of cooperation is required to implement Chapter 1, but is not of such a magnitude as to create "excessive" entanglement. Plaintiffs appeal.

---

**3.** In *Wheeler v. Barrera*, 417 U.S. 402, 421–22, 94 S.Ct. 2274, 2285–86, 41 L.Ed.2d 159 (1974), the Supreme Court held that the predecessor statute to Chapter 1 required that eligible parochial

school students receive "comparable," though not identical, services to those given to public school students.

The Plaintiffs also claim that the requirement of equal expenditures for private schools, the "bypass" provision .of Chapter 1, and the requirement of consulting with private school officials, create an unconstitutional "veto" power over the delivery of a public benefit. They argue that this creates a joint exercise of authority which creates political divisiveness and excessive entanglement. The district court rejected these claims because the final decision-making authority rests with the Secretary and the bypass provisions do not shift responsibility to the religious school officials. Plaintiffs appeal.

Articulated as part of plaintiffs' "veto" arguments (although analytically distinct), plaintiffs challenge the deduction of *Aguilar* costs "off-the-top" of the budget, claiming that public school students bear the burden of providing Chapter 1 services to parochial school students. The district court rejected these claims, as well, holding that the costs of providing Chapter 1 services to parochial school students were not so disproportionate as to be merely a ruse for conferring a greater benefit to the parochial students. Plaintiffs appeal.

The Plaintiffs' last challenge to Chapter 1 is to a District proposal to lease "neutral sites" from the Catholic Archdiocese of San Francisco to provide Chapter 1 services on parochial school premises. DOE argues that this issue is moot because the parties never entered these leases and neither party intends to enter such leases in the future. The district court agreed with plaintiffs that the leases were not moot because of the future possibility of such leases. DOE, the District, California Department of Education, and the intervenors appeal.

## II. *Chapter 2 Services*

Chapter 2 of the ECIA, 20 U.S.C. § 2911, *et seq.* (1988), provides financial assistance through "block grants" to State and local education agencies in seven areas of "targeted assistance," including the "acquisition and use of instructional and educational materials, [such as] library books, reference materials, computer software and hardware for instructional use, and other curricular materials that would be used to improve the quality of instruction." *See* 20 U.S.C. § 2941(b)(2); 34 C.F.R. § 298.12.[4]

The statute provides for the participation of private school students on an equitable basis, with equal expenditures for private and public school students. *See* 20 U.S.C. § 2972(a), (b); 34 C.F.R. §§ 298.31, 298.34. The materials provided must be "secular, neutral, and nonideological," 20 U.S.C. § 2972(a)(1); 34 C.F.R. § 298.31, and may not supplant funds that would otherwise be made available for school programs from nonfederal sources. *See* 34 C.F.R. § 298.35. As with Chapter 1, public school officials must consult with the private schools before providing these services. *See* 20 U.S.C. § 2972(a); 34 C.F.R. § 298.32. The control of funds and title to all materials and equipment remains with the public agency, and all services must be provided by employees of a public agency or through contract with a provider independent of the private school or any religious organization. *See* 20 U.S.C. § 2972(c); 34 C.F.R. §§ 298.31(a)(3)–(4), 298.36. A similar "bypass" is provided for alternate provision of these services if the school district cannot or fails to provide these services on an equitable basis. *See* 20 U.S.C. § 2972(a)(2), (d), (e); 34 C.F.R. § 298.38.

4. The use of Chapter 2 funds for other areas of "targeted assistance" are not at issue in this appeal. These include

(1) programs to meet the educational needs of students at risk of failure in school and of dropping out and students for whom providing an education entails higher than average costs; ... (3) innovative programs designed to carry out schoolwide improvements ...; (4) programs of training and professional development to enhance the knowledge and skills of educational personnel ...; (5) programs designed to enhance personal excellence of students and student achievement, including instruction in ethics, performing and creative arts, humanities, activities in physical fitness and comprehensive health education, and participation in community service projects; and (6) other innovative projects which would enhance the educational program and climate of the school, including programs for gifted and talented students, technology education programs, early childhood education programs, community education and programs for youth suicide prevention.

20 U.S.C. § 2941(b)(1), (b)(3)–(b)(6).

■ Plaintiffs challenge the provision of Chapter 2 funds to parochial schools as direct aid to a pervasively sectarian institution. The district court ruled that Chapter 2 did not violate the Establishment Clause, either on its face or as applied.[5] The court reasoned that Chapter 2 is a program assisting a broad class of beneficiaries without regard to religion, the instructional materials provided to the parochial schools in San Francisco were not "divertible" to religious uses, and the nondivertible instructional materials do not require intensive monitoring in violation of the excessive entanglement prong. Plaintiffs appeal this ruling.[6]

## DISCUSSION

I. *Chapter 1 Services*

A. *Does the provision of Chapter 1 services by mobile classrooms parked temporarily on sectarian school grounds violate the Establishment Clause?*

■ Under *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), a statute or governmental action does not run afoul of the Establishment Clause if: (1) it has a secular legislative purpose; (2) its principal or primary effect is neither to advance nor inhibit religion; and (3) it does not foster excessive government entanglement with religion.

1. *Does Chapter 1 have a valid secular purpose?*

■ The district court correctly held that Chapter 1 has a valid secular legislative purpose. *Walker v. San Francisco Unified Sch. Dist.,* 761 F.Supp. 1463, 1467 (N.D.Cal.1991). The statute's civic purpose "is to improve the educational opportunities of educationally deprived children by helping such children succeed in the regular program of the local educational agency, attain grade-level proficiency, and improve achievement in basic and more advanced skills." 20 U.S.C. § 2701(b). Of course, government has "a legitimate interest in facilitating education of the highest quality for all children within its boundaries, whatever school their parents have chosen for them." *Wolman v. Walters,* 433 U.S. 229, 262, 97 S.Ct. 2593, 2613, 53 L.Ed.2d 714 (1977) (Powell, J., concurring); *see also Meek v. Pittenger,* 421 U.S. 349, 363, 95 S.Ct. 1753, 1762, 44 L.Ed.2d 217 (1975) (holding that providing "ample opportunity" to all children "to develop their intellectual capacities" is a legitimate secular legislative purpose).

2. *Does Chapter 1 have a principal or primary effect that advances or inhibits religion?*

The district court applied a bright-line test between services provided *on* parochial

---

5. On appeal, the parties do not make a distinction between the validity of the statute on its face and as applied. Although the *Supreme Court in Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), distinguished between a statute's constitutionality on its face and as applied, the Court noted that few cases "in the Establishment Clause area have explicitly distinguished between facial challenges to a statute and attacks on the statute as applied." *Id.* at 600, 108 S.Ct. at 2569. Because both methods of analysis require reference to the *Lemon* test, any distinction carries little utility. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). Further, an analysis under *Lemon* of the "facial" validity of a statute is informed by how that statute is applied; i.e., does it have a primary effect of advancing religion and does it lead to excessive entanglement between church and state.

6. The plaintiffs also included in their complaint a cause of action stating that Chapter 2 violated Article XVI, section 5 of the California Constitution. The plaintiffs concede, however, that the state constitutional issue "was not the subject of motions by any party and was not discussed by the court below...." Plaintiff's Opening Brief, at 2–3. We thus decline to address this issue because Plaintiffs appeared to have abandoned the state constitutional claim before the district court.

It is apparent why plaintiffs chose such a course of action. Even if plaintiffs had prevailed on the state constitutional argument, their victory would have been a pyrrhic one. A federal statute, such as Chapter 2, cannot be invalidated under a state constitution. U.S. Const. Art. VI, cl. 2. The most that plaintiff's argument would have accomplished is to require state agencies not to participate in providing Chapter 2 benefits to parochial schools. But that would merely trigger 20 U.S.C. § 2972(d), which requires the Secretary of Education to bypass the state and to "arrange for the provision of service to [parochial] children" through other, more expensive, means. The net result would be the same program that currently exists, but with reduced funding for both public and parochial schools resulting from the added administrative costs.

school property and those provided *off* the school grounds. The district court first concluded that mobile classrooms parked off parochial school grounds are religiously neutral sites, and thus the remedial services are not offered in a "pervasively sectarian" atmosphere. *Walker,* 761 F.Supp. at 1468. The court emphasized:

> [T]he vans are owned by the District, are clearly identified as property of the District, contain no religious symbols whatsoever and, with four exceptions, are not located on parochial school property. Furthermore, the vans are used only to provide Chapter 1 remedial services, and are in no way used by the parochial schools themselves. Finally, classes taught in the vans are taught solely by public school teachers.

*Id.* at 1469.

The district court also rejected the plaintiff's contention that parking the mobile vans *near* the parochial schools created a symbolic union between church and state:

> [T]he religious classes and the Chapter 1 classes are not taught in the same building. In fact, to get to those classes being taught in mobile units located off the parochial school campuses, the students must physically leave the campus, albeit in many instances by only a short distance. This factor makes it likely that the students and public at large will "discern the crucial difference between the religious school classes and the 'public school' classes."

*Id.* (citation omitted).[7]

In contrast, the district court concluded that parking the mobile classrooms *on* parochial school property had the effect of advancing religion because on-site parking rendered the van less religiously neutral and created an impermissible symbolic link between church and state. *Id.* at 1471. The court believed that when the students attend Chapter 1 classes in mobile classrooms on campus, the students would not discern the difference between their religious and public school classes, and the public might easily conclude that the District and the religious

school "are engaged in a cooperative effort." *Id.*

DOE argues that the district court was wrong in its conclusion that parking the mobile vans on school property creates a "symbolic union" between church and state, and that in any event, such a "union" is not sufficient to invalidate the program. DOE stresses that a "symbolic union" has been found only where public services were provided in a "pervasively sectarian atmosphere"; i.e., inside parochial schools.

DOE contends that the Supreme Court cases focus on whether funds flow to a pervasively sectarian institution, and thus run the risk of use for religious indoctrination or result in a subsidy of a religious institution. DOE emphasizes that the Chapter 1 funds do not flow to the parochial schools at all; rather, the District administers the Chapter 1 program and directly provides the benefits to certain parochial school students. DOE also notes that the mobile units play no part in any religious activity and are under the total control of public personnel.

Further, DOE argues that there is no danger of Chapter 1 funds constituting an indirect subsidy to the religious functions of the schools. DOE stresses that Chapter 1 regulations require that the funds be used to provide services that supplement, not supplant, services that would otherwise be available to parochial school students. DOE also emphasizes that Chapter 1 only benefits educationally deprived children, and funds cannot be used for the needs of the school, nor the general needs of the children in the school.

Finally, DOE argues that even if an on-premises/off-premises test is applied, the word "premises" does not necessarily mean the entire school property. DOE contends that because the Supreme Court has not addressed the provision of services to parochial school students on school property but outside of school buildings, the references to "premises" can be construed as referring only to the actual school building.

---

7. The plaintiffs do not appeal the district court's ruling that parking the mobile classrooms off or near parochial school grounds is constitutional.

The intervenors mirror many of DOE's arguments, and they will not be repeated here. Further, the intervenors urge that the Establishment Clause does not prevent a "practical response to the logistical difficulties of extending needed and desired aid to all the children of the community." *Wolman*, 433 U.S. at 247 n. 14, 97 S.Ct. at 2605 n. 14. They stress the difficult situation in which school districts find themselves after *Aguilar*: *Wheeler v. Barrera* requires the provision of equitable services, as codified in the statute, while *Aguilar* prevents the provision of those services in parochial schools. The intervenors argue that cooperation between the state and church is not prohibited by the Establishment Clause, and that in fact the message communicated by the provision of remedial services in mobile classrooms, whether parked on parochial school grounds or not, is hostility to religion, not cooperation or "union" between the church and state.

In response, the plaintiffs focus on their contention that the provision of Chapter 1 services on the parochial school campus creates a symbolic union between church and state. They stress that parochial school officials maintain authority over both the property and students on the parochial school campus and determine where the mobile classrooms are placed, and that the entire campus is "physically identified" with the functions of the school. *See Wolman*, 433 U.S. at 246–47, 97 S.Ct. at 2605 (upholding program that was neither "physically nor educationally identified with the functions of the nonpublic school"). The plaintiffs further challenge the district court's conclusion that the mobile vans are "religiously neutral," since the vans are parked on the campus within an area containing religious symbols, including crucifixes and religious statues.

In *School Dist. of the City of Grand Rapids v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), the Supreme Court invalidated two state programs in which public school instructors taught secular "supplementary" courses in parochial schools, such as remedial enrichment mathematics, reading, art, music and physical education, and after-school classes in art, home economics, and drama for both children and adults. *Id.*

at 375–77; 105 S.Ct. at 3218–19. The Court expressed concern that the instructors would be "influenced by the pervasively sectarian nature of the religious schools," resulting in religious indoctrination at public expense, and that "the symbolic union of church and state inherent in the provision of secular, state-provided instruction in the religious school buildings threaten[ed] to convey a message of state support for religion to students and to the general public." *Id.* at 397; 105 S.Ct. at 3230. Other state programs providing services *in* parochial schools have similarly been struck down. *See, e.g., Meek v. Pittenger*, 421 U.S. 349, 371, 95 S.Ct. 1753, 1766–67, 44 L.Ed.2d 217 (1975) (invalidating state program providing guidance, testing, remedial and therapeutic services by public employees in parochial schools).

On the other hand, the Supreme Court has upheld the provision of remedial services to parochial school students off parochial school grounds entirely. In *Wolman*, for instance, the Court upheld state provision of therapeutic, guidance, and remedial services for needy parochial students in the public schools and in mobile units located *off* the nonpublic school property. 433 U.S. at 248, 97 S.Ct. at 2605. The Court upheld these practices because the services were provided at sites that were "neither physically nor educationally identified with the functions of the nonpublic school." *Id.* at 246–47, 97 S.Ct. at 2605.

While the district court understandably drew an on-property/off-property "bright-line" distinction from these precedents, we decline to do so. The Supreme Court has not addressed the provision of services to parochial school students on school property but outside of school buildings. *See Aguilar*, 473 U.S. at 406, 105 S.Ct. at 3218 (addressing services provided in parochial school classrooms); *Ball*, 473 U.S. at 375, 105 S.Ct. at 3218 (same); *Wolman*, 433 U.S. at 245, 97 S.Ct. at 2604 (addressing services off-property); *see also Pulido v. Cavazos*, 934 F.2d 912, 923 (8th Cir.1991) (noting that the Supreme Court has addressed only services provided in parochial school buildings or off the parochial school property entirely). Because the Court has not addressed this precise issue, its use of the word "premises" in these opin-

ions does not give us guidance. *See Wolman,* 433 U.S. at 248, 97 S.Ct. at 2605 ("providing therapeutic and remedial services at a neutral site off the premises of the nonpublic schools will not have the impermissible effect of advancing religion"); *Ball,* 473 U.S. at 386, 105 S.Ct. at 3223–24 (explaining that *Meek* invalidated instructional services "on the premises of the nonpublic schools").

Rather, we find guidance in the Supreme Court's recent decision in *Zobrest v. Catalina Foothills Sch. Dist.,* — U.S. ——, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993). In *Zobrest,* the parents of a deaf student brought an action to require a school district to provide an interpreter for the student's Catholic high school classes pursuant to the Individuals with Disabilities Education Act (IDEA). The Court held that the Establishment Clause does not prevent the provision of an interpreter *in* the parochial school, emphasizing that "we have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit." *Id.* at ——, 113 S.Ct. at 2466, *citing Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (Establishment Clause not violated by Minnesota law allowing taxpayers to deduct certain educational expenses, even though most deductions went to parents of sectarian school students), and *Witters v. Washington Dept. of Serv. for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986) (upholding vocational assistance to blind person studying at a private Christian college). The Court stated, "When the government offers a neutral service on the premises of a sectarian school as part of a general program that is in no way skewed towards religion, it follows under our prior decisions that provision of that service does not offend the Establishment Clause." *Zobrest,* — U.S. at ——, 113 S.Ct. at 2467 (internal quotations omitted).

■ One way in which a general program can be "skewed towards religion" is if the program creates a symbolic union between church and state. *Ball,* 473 U.S. at 389, 105

S.Ct. at 3226. In commenting upon *McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), where the Court held that a public school may not permit part-time religious instruction on its premises as a part of the school program, the *Ball* Court emphasized that the program was struck down because "[t]he symbolic connection of church and state in the *McCollum* program presented the students with a graphic symbol of the 'concert or union or dependency' of church and state." *Ball,* 473 U.S. at 391, 105 S.Ct. at 3226.

■■ *Zobrest* and *Ball* thus clarify that the focus of Establishment Clause analysis is not the physical location of a public benefit for parochial school students. Rather, these cases instruct us that the touchstone of Establishment Clause analysis is whether the government is acting neutrally towards religion. *Zobrest,* — U.S. at ——, 113 S.Ct. at 2466; *Ball,* 473 U.S. at 382, 105 S.Ct. at 3221–22 (stating that the Court consistently requires the government "to maintain a course of neutrality among religions, and between religion and nonreligion"); *see also Committee for Public Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 792–93, 93 S.Ct. 2955, 2975, 37 L.Ed.2d 948 (1973) (stating that "[a] proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion"); *Board of Educ. of Kiryas Joel v. Grumet,* — U.S. ——, ——, 114 S.Ct. 2481, 2487, 129 L.Ed.2d 546 (1994) (same). Government neutrality becomes suspect when, in practical effect, the governmental aid is targeted at or disproportionately benefits religious institutions, or when, in symbolic effect, the governmental aid creates a symbolic union between church and state. We therefore must analyze (1) whether the benefit at issue is a general welfare benefit neutrally available to a broad class of people without reference to religion, *Zobrest,* — U.S. at ——, 113 S.Ct. at 2466, and (2) whether the benefit, even though generally available, creates a symbolic union of church and state. *Ball,* 473 U.S. at 389, 105 S.Ct. at 3226.

■ Applying these factors, Chapter 1 services and the temporary parking of mobile

classrooms on parochial school property does not violate the Establishment Clause. Chapter 1 services are a generally available benefit: they are provided to all educationally deprived children without regard to religion. Moreover, Chapter 1 services are codified in one generally applicable statute, and the services supplement but do not supplant the level of services that would otherwise be available in the absence of Chapter 1.[8] Chapter 1 services thus are not a subterfuge to channel money to religious schools, but rather, Chapter 1 has the primary effect of improving education for educationally deprived children.

A more difficult question is whether temporarily parking the mobile classrooms on parochial school grounds creates a symbolic union of church and state. In some cases, the vans are located next to the stations of the cross or along walls with crucifixes. In *Ball*, the Court explained that an unconstitutional "symbolic union" has been found when the government "fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations." *Ball*, 473 U.S. at 389, 105 S.Ct. at 3225. "If this identification conveys a message of government endorsement or disapproval of religion," the Establishment Clause is violated. *Id.* The *Ball* Court also found a symbolic connection between church and state when public services are provided in a "pervasive religious atmosphere." *See Ball*, 473 U.S. at 397, 105 S.Ct. at 3226.

■ Here, we find that temporarily parking mobile vans on parochial school grounds does not foster a close identification of the government's powers and responsibilities with those of religion such that the identification conveys a message of government endorsement or disapproval of religion. As noted by the district court, the vans are clearly marked as the property of the District, contain no religious symbols whatsoever, and are never used by parochial school personnel. Moreover, only secular subjects are taught in the mobile classrooms, the

classes are taught by nonparochial teachers, and no mention is made of religious topics. Finally, school children must physically leave their school building to enter the temporarily parked van. We agree with the Eighth Circuit that government does not "convey a message of state support for religion to students and the general public" when the remedial educational services "are provided by nonparochial school teachers in mobile and portable units that are separate and distinct from the parochial school classrooms and buildings." *Pulido v. Cavazos*, 934 F.2d 912, 920 (8th Cir.1991).

To determine whether the vans' location next to religious symbols is sufficient to create a symbolic union between church and state by rendering the mobile classrooms *themselves* "pervasively sectarian," we must look to the purpose of that inquiry. In *Ball*, the Court explained that a pervasively sectarian atmosphere may cause teachers to "subtly (or overtly) conform their instruction to the environment in which they teach, while students will perceive the instruction provided in the context of the dominantly religious message of the institution, thus reinforcing the indoctrinating effect.... [T]here is a substantial risk that programs operating in this environment would be used for religious educational purposes." 473 U.S. at 388, 105 S.Ct. at 3225 (citations and internal quotations omitted). In *Wolman*, the Court similarly recognized that public education in a pervasively sectarian atmosphere raised problems "because the pressures of the environment might ·alter [a teacher's] behavior from its normal course. So long as these types of services are offered at truly religiously neutral locations, [this] danger ... does not arise." 433 U.S. at 247, 97 S.Ct. at 2605.

■ Although some of the vans are parked in areas of the school yard with religious symbols, we see no danger that the Chapter 1 teachers would "subtly (or overtly) conform their instruction to the [religious] environment" of the parochial school, nor that "stu-

---

8. An LEA cannot use Chapter 1 benefits to meet the needs of the parochial school or the general needs of children in the school. Like the sign language interpreter in *Zobrest*, —— U.S. at ——,

113 S.Ct. at 2469, Chapter 1 benefits are provided directly to the educationally deprived students. *See* 34 C.F.R. § 200.53.

dents will perceive the instruction provided in the context of the dominantly religious message of the institution," simply because of the vans' proximity to religious symbols. *See Ball,* 473 U.S. at 388, 105 S.Ct. at 3225. To so conclude would remove Establishment Clause analysis from all semblance of practical application, and would elevate the theoretical above the actual effect on students and teachers. The mobile classrooms are *themselves* completely neutral sites. Chapter 1 students must leave the religious school building to enter a van, marked as property of the school district, which contains no religious symbols whatsoever, and in which completely secular subjects are taught. There is no risk that these mobile classrooms on parochial school property "would be used for religious educational purposes." 473 U.S. at 388, 105 S.Ct. at 3225. Moreover, unlike in *Ball,* where religious and public school classes were taught in the same building, the Chapter 1 students will "discern the crucial difference between the religious school classes and the public school classes." *See Ball,* 473 U.S. at 391, 105 S.Ct. at 3226 (internal quotation omitted).

The Eighth Circuit came to a similar conclusion. In *Pulido,* 934 F.2d at 919–20, the court held that Chapter 1 services in mobile units parked on parochial school property "are provided in a religiously neutral atmosphere": the units were separate from the parochial school buildings, the public agency controlled the units, parochial school personnel could not use the mobile units for any purpose, the units did not contain any religious symbols, and only secular subjects were taught.

Because Chapter 1 services are a neutrally-available benefit that provide only an attenuated financial benefit to parochial schools, and because temporarily parking mobile classrooms on parochial school grounds does not create a symbolic union of church and state, Chapter 1 neither advances nor inhibits religion.

### 3. *Does Chapter 1 create excessive entanglement between church and state?*

The plaintiffs argue that excessive entanglement is created by the day-to-day contacts between the Chapter 1 teachers and the parochial school personnel. Chapter 1 teachers may use the parochial school's lounge and lunchroom, may consult with regular classroom teachers in the mobile vans outside of instructional time or in the regular classrooms if there are no other alternatives, and occasionally observe Chapter 1 students in their regular classrooms. Contact is allowed during the workday only to the extent necessary to coordinate the Chapter 1 program with classroom instruction and to improve the success rate of the Chapter 1 students. The district court found that this cooperation was necessary to the implementation of Chapter 1, and was not of the magnitude sufficient to create Establishment Clause problems. *Walker,* 761 F.Supp. at 1474.

In *Aguilar,* the Supreme Court raised concerns with excessive entanglement arising, in part, from extensive administrative contacts between public and parochial school personnel:

> The administrative cooperation that is required to maintain the educational program at issue here entangles church and state in still another way that infringes interests at the heart of the Establishment Clause. Administrative personnel of the public and parochial school systems must work together in resolving matters related to schedules, classroom assignments, problems that arise in the implementation of the program, requests for additional services, and the dissemination of information regarding the program. Furthermore, the program necessitates frequent contacts between the regular and the remedial teachers (or other professionals), in which each side reports on individual student needs, problems encountered, and results achieved.

*Aguilar,* 473 U.S. at 413, 105 S.Ct. at 3238 (internal quotation omitted).

This language, taken by itself, would seem to bar *any* implementation of a Chapter 1 program for parochial school children, even that provided in a public school, due to the administrative cooperation required to implement the program. However, *Aguilar* did not so rule. In fact, plaintiffs concede that

Chapter 1 classes for parochial students in public school classrooms are constitutional.

■ When taken in context with the Court's entire discussion of excessive entanglement in *Aguilar,* it becomes obvious that the constitutional concern with day-to-day administrative contacts is minimal. The Court's primary concern was that pervasive monitoring by public authorities *in parochial schools*—which was needed to prevent the inculcation of religion by public teachers— would create a danger to the particular religion because the religion "must endure the ongoing presence of state personnel whose primary purpose is to monitor teachers and students in an attempt to guard against the infiltration of religious thought." *Aguilar,* 473 U.S. at 413, 105 S.Ct. at 3238. Administrative contacts regarding the provision of services *outside* a pervasively sectarian atmosphere, however, is not constitutionally suspect. *See Bowen v. Kendrick,* 487 U.S. 589, 616–17, 108 S.Ct. 2562, 2578, 101 L.Ed.2d 520 (1988) (monitoring of grants to religiously-affiliated organizations which were not pervasively sectarian did not amount to excessive entanglement); *Wolman,* 433 U.S. at 248, 97 S.Ct. at 2605 (rejecting entanglement challenge where services were provided in a neutral site outside of the pervasively sectarian atmosphere of the parochial school). Here, the monitoring involved in ensuring the secular nature of Chapter 1 services in mobile classrooms takes place outside the parochial school building and involves only the monitoring of *public employees* by public officials. "It can hardly be said that the supervision of public employees performing public functions [in] public property creates an excessive entanglement between church and state." *Wolman,* 433 U.S. at 248, 97 S.Ct. at 2605.

Some amount of interaction (entanglement) is tolerable under the First Amendment. *See Bowen,* 487 U.S. at 609, 108 S.Ct. at 2574

(noting "the long history of cooperation and interdependency between governments and charitable or religious organizations"). We conclude that the interactions between Chapter 1 and parochial school personnel required for the implementation of the Chapter 1 program does not constitute excessive entanglement.[9] The provision of Chapter 1 services to parochial school students does not result in excessive entanglement between church and state.

### 4. Conclusion

Chapter 1 has the valid secular legislative purpose of improving the educational opportunities of educationally deprived children. Moreover, Chapter 1 services and the temporary parking of Chapter 1 mobile classrooms on parochial school property does not have the principal or primary effect of advancing religion: Chapter 1 services are available to all educationally deprived children without reference to religion, and the mobile classrooms themselves are religiously neutral sites in which there is no risk of religious indoctrination. Finally, the administrative cooperation necessary to implement Chapter 1 does not result in excessive entanglement between church and state. Under the *Lemon* test, the provision of Chapter 1 services to parochial school students via mobile classrooms survives the Establishment Clause challenge.

### B. Do the procedures for implementing and funding Chapter 1 violate the Establishment Clause?

The plaintiffs challenge the procedures for implementing and funding Chapter 1 services for parochial school students. They contend that the "equal expenditure" provision, *see* 20 U.S.C. § 2727(a), the bypass provision which allows the parochial school to obtain services from an alternate provider if the school district violates the equal expenditure provision,

---

9. Plaintiffs also argue that the provision of Chapter 1 services on parochial school grounds creates political divisiveness, and is thus violative of the Establishment Clause. Even if we were to find some political divisiveness, that by itself is not sufficient to 'create an Establishment Clause violation. "[T]he question of political divisiveness should be regarded as confined to cases

where direct financial subsidies are paid to parochial schools or to teachers in parochial schools." *Bowen,* 487 U.S. at 617 n. 14, 108 S.Ct. at 2578, n. 14 (internal quotations omitted), *citing Mueller,* 463 U.S. at 404 n. 11, 103 S.Ct. at 3071, n. 11. Chapter 1 does not provide direct subsidies to parochial schools.

see 20 U.S.C. § 2727(b), and the requirements of consultation with private school officials, see 20 U.S.C. § 2727(a), combine to provide parochial schools with an unconstitutional "veto power" over the delivery of public services. Presumably, the argument is that because the expenses of a bypass come "off-the-top" of the District's Chapter 1 budget, the parochial school officials wield power over the administration of Chapter 1 through the threat of a bypass.

As support for their "veto" argument, plaintiffs cite *Larkin v. Grendel's Den*, 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), which invalidated a Massachusetts statute that gave churches and schools the power to veto applications for liquor licenses within a 500–foot radius of the church or school. The Court stated that "mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion," *id.* at 125–26, 103 S.Ct. at 511, and "creates the danger of political fragmentation and divisiveness on religious lines." *Id.* at 127, 103 S.Ct. at 512 (quotation omitted).

The Supreme Court has previously held, however, that the equal expenditure and consultation requirements of the predecessor statute to Chapter 1 did not give private schools veto power over the program. *See Wheeler*, 417 U.S. at 424, 94 S.Ct. at 2286–87. *Wheeler* emphasized that the statute placed "ultimate responsibility and control with the public agency," and that a private school's refusal to participate does not constitute a "veto" on the program. *Id.* at 424, 94 S.Ct. at 2286.

■ While the statute considered by *Wheeler* did not contain a bypass provision, we agree with the district court that the bypass provision does not shift responsibility to religious school officials. *Walker*, 761 F.Supp. at 1473. Control over the delivery of Chapter 1 services remains in the public agency at all times. There are considerable restrictions on a parochial school's control of Chapter 1 services. The Secretary must make an affirmative determination that a bypass is justified and a parochial school cannot demand a bypass if the Chapter 1 program is equitable. Moreover, the bypass determination is subject to administrative and judicial review. *See* 20 U.S.C. § 2727(b)(4)(B)–(D); 34 C.F.R. §§ 76.670–.676. Chapter 1 thus does not vest any "discretionary authority over public schools" to parochial school officials in a "context that gives no assurance that governmental power has been or will be exercised neutrally." *See Kiryas Joel*, —— U.S. at ——, 114 S.Ct. at 2487 (plurality).

■ The plaintiffs also challenge the practice of taking the cost of obtaining mobile classrooms "off the top" of the District's Chapter 1 budget. *See* 34 C.F.R. § 200.52(a)(2). They argue that the practice violates the Establishment Clause by providing more money to parochial school students than to public school students, and puts the major burden of accommodating parochial school students on the public schools.[10]

*Aguilar* costs are taken "off-the-top" like all other administrative costs, such as program reproduction services, fiscal and accounting services, and hiring and placement of program personnel. No private school officials are involved in the computation of costs associated with mobile classrooms. We agree with the Seventh and Eighth Circuits that this funding system is religiously neutral and thus does not violate the Establishment Clause. *See Board of Educ. of the City of Chicago v. Alexander*, 983 F.2d 745, 753–57 (7th Cir.1992); *Pulido*, 934 F.2d at 924–28.

The Supreme Court has held that services between public and nonpublic school students must be "comparable," not "identical." *Wheeler*, 417 U.S. at 421–22, 94 S.Ct. at 2285–86. Here, the remedial education services provided to public and private school students were comparable.

Moreover, the costs of providing these services to parochial school students were "not so disproportionate as to become apparent that the program is merely a ruse to confer a benefit to the parochial school children."

10. Some of the expenses related to the mobile classrooms were covered by Congress' appropriation of extra funds to be used for capital expenses incurred in complying with *Aguilar*. *See* 20 U.S.C. § 2727(d)(3); 34 C.F.R. § 200.57(a)(2).

*Walker,* 761 F.Supp. at 1471, *citing Members of Jamestown Sch. Comm. v. Schmidt,* 699 F.2d 1, 10 (1st Cir.), *cert. denied,* 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983); *see also Barnes v. Cavazos,* 966 F.2d 1056, 1065–66 (6th Cir.1992) (expenditures to comply with *Aguilar* did not result in "grossly disproportionate" funding for parochial students). *But cf. Pulido,* 934 F.2d at 926 (error to use the *Schmidt* test as an analytical framework). For example, in the 1986–87 school year in which the District purchased the mobile classrooms, only 5% of the Chapter 1 budget was expended for this purpose.[11] In latter years, an even lower percentage of the budget—ranging from 2% to .4%—was used to maintain the vehicles.[12] In addition, for each year, the amount spent on actual instructional services for each participating public and private student was equal.

If the cost of mobile classrooms was deducted solely from those Chapter 1 funds allocated to parochial school students, the educational services provided to parochial students would be drastically reduced, and those students would not receive comparable benefits. We conclude that the procedures for implementing and funding Chapter 1 services to parochial students do not violate the Establishment Clause.

C. *Is the issue of providing Chapter 1 services in space leased from religious organizations moot?*

██ Immediately after the *Aguilar* decision the District proposed leasing space in "neutral sites" located on parochial school campuses owned by the Archdiocese of San Francisco. When objections were received to the proposed lease agreements, no formal lease agreements were executed, money paid to the Archdiocese for use of classrooms pending the leases was returned, and the District announced its intention not to enter such leases in the future.

The district court held that because defendants could resume leasing property from religious organizations at any time, the issue was not moot "unless defendants are willing to stipulate to an order enjoining them from entering into any such leases in the future." *Walker,* 761 F.Supp. at 1474. We disagree. Although "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," a case may still become moot if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289 and n. 10, 102 S.Ct. 1070, 1074 and n. 10, 71 L.Ed.2d 152 (1982) (internal citations omitted).

Because the District has purchased mobile vans and computers to assist in its obligations to provide Chapter 1 services to parochial school students, it is exceedingly unlikely that the District will enter any leases in the future with the Archdiocese or any other religious organization. Moreover, the parties have stipulated that "for all purposes of this action alone, some of the sites identified for leasing were generally indistinguishable from the church school classrooms in *Aguilar.*" The District would be hard pressed to later defend, and perhaps be estopped from later defending, the leasing of parochial school sites.

We conclude that it is "absolutely clear that the allegedly wrongful behavior [cannot] reasonably be expected to recur." *City of Mesquite,* 455 U.S. at 289 n. 10, 102 S.Ct. at 1074 n. 10. The challenge to leasing Archdiocese property for Chapter 1 classes is moot.

II. *Chapter 2 Funding*

A. *Does Chapter 2 funding for parochial schools violate the Establishment Clause?*

The District has participated in the Chapter 2 program since the 1982–83 school year. The District annually requests a Chapter 2 grant by submitting to the California State Board of Education an "Application for

---

**11.** The mobile classrooms cost $368,126 out of a total budget of $7,088,609.

**12.** In 1987–1988, the District spent $166,924 on mobile classrooms, out of a total budget of $7,597,646 (2%). In 1988–1990 (a two-year period), $82,472 was spent on mobile classrooms, out of an $18,143,082 budget (.4%).

**1464**

Funding Consolidated Categorical Aid Programs." In the 1988–89 school year, approximately seventy-four percent of the Chapter 2 benefits went to public schools and twenty-six percent went to private schools. Private schools receive Chapter 2 materials and equipment based on the per capita number of students at each school. (In that year, there were over 23,000 students in private schools.) The District was awarded $903,028 in Chapter 2 funds and set aside $195,482 for materials and equipment to private schools. Although the parties did not provide a specific figure, a substantial number of the nonpublic school students attended secular private schools. Thirty-two of the eighty-seven nonpublic schools participating in the Chapter 2 program are secular.

In order to receive Chapter 2 materials, private schools submit "needs assessment" forms to the District that describe the needs of their student population and how those needs can be met through the utilization of Chapter 2 funds. The District screens each school's order to ensure that all materials are secular in nature. Each private school signs a certification that the materials and equipment will be used for secular, neutral, and nonideological purposes, and that they will supplement and not supplant the level of services that would be provided in the absence of Chapter 2 benefits. The District is also required to provide the State Board assurances that it will comply with Chapter 2 and its regulations, including that Chapter 2 services, equipment, supplies, and. instructional materials will be supplementary to the basic education of the private schools. When the Chapter 2 funds are received, the District directly purchases the materials for the private schools; title to all materials and equipment remains with the District. No funds are provided directly to the private schools.

Since 1982, private schools have received library books, textbooks, videos, overhead projectors, movie and slide projectors and projection stands, television sets, record players, cassette recorders, VCR's, video cameras, "listening centers," globes and maps, microscopes and other lab equipment, computer equipment, musical equipment, stereo systems, and desks and tables. Expenditures were not allowed for materials to be used in religious instruction or worship, or materials for administration or office use. In the 1989–90 school year, private schools received only prescreened library books and prescreened instructional and reference materials. Although private schools had previously been provided with "locked" computer hardware and software that could not be diverted to religious use,[13] there were no funds available for computers in 1989–90.

1. *Does Chapter 2 have a valid secular purpose?*

■ The purpose of Chapter 2 is to improve resources available to schools to increase the quality of education. Specifically, it is

(1) to provide the initial funding to enable State and local educational agencies to implement promising educational programs ...; (2) to provide a continuing source of innovation, educational improvement, and support for library and instructional materials; (3) to meet the special educational needs of at risk and high cost students ...; (4) to enhance the quality of teaching and learning ...; and (5) to allow State and local educational agencies to meet their educational needs and priorities for targeted assistance.

20 U.S.C. § 2911(b). The improvement of education is a valid secular purpose. *Meek v. Pittenger*, 421 U.S. at 363, 95 S.Ct. at 1762.

2. *Does Chapter 2 have a primary or principal effect that advances or inhibits religion?*

In *Board of Educ. v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), the Supreme Court upheld the loaning of state-owned textbooks to parochial school students. *Id.* at 248, 88 S.Ct. at 1929, *Meek* and *Wolman*, however, drew a distinction between providing textbooks and providing other instructional materials—such as maps, overhead projectors, and lab equipment—to paro-

---

**13.** However, the Project Head for the District's Chapter 2 program stated in October, 1988, that none of the computers provided to parochial schools were so limited in their application.

chial schools or their students. *Meek*, 421 U.S. at 362–63, 95 S.Ct. at 1761–62; *Wolman*, 433 U.S. at 237, 251, 97 S.Ct. at 2600, 2607. Subsequent Supreme Court cases—*Regan, Ball,* and *Zobrest*—have clarified the holdings of *Meek* and *Wolman,* and rendered untenable the thin distinction between textbooks and other instructional materials. We read *Allen, Regan, Ball,* and *Zobrest* as controlling our decision in the instant case, and we hold that under Chapter 2, the loaning of neutral, secular equipment and instructional materials to parochial schools does not have the primary or principal effect of advancing religion.

In *Allen,* the Court upheld a law requiring public school authorities to lend textbooks, free of charge, to all students of public and private schools. Such a program did not serve to advance religion because, *inter alia,* "[t]he law merely makes available to all children the benefits of a general program to lend school books free of charge." *Allen,* 392 U.S. at 243, 88 S.Ct. at 1926. The fact that "free books make it more likely that some children choose to attend a sectarian school ... does not alone demonstrate an unconstitutional degree of support for a religious institution." *Id.* at 244, 88 S.Ct. at 1926–27. *Allen* thus rests on the robust principle that "the Establishment Clause does not prevent a State from extending the benefits of state laws to all citizens without regard for their religious affiliation." *Id.* at 242, 88 S.Ct. at 1926 (citing *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (upholding New Jersey law that reimbursed parents for expenses incurred in busing their children to parochial schools as part of a general program under which New Jersey reimbursed parents of pupils bused to both public and nonpublic schools)).

In *Meek,* the Supreme Court departed from the principle that state benefits provided to all citizens without regard to religion are constitutional. The Court upheld the provision of textbooks to parochial school students, 421 U.S. at 362, 95 S.Ct. at 1761–62, but struck down the program which loaned instructional materials and equipment, including maps, charts and laboratory supplies, to parochial schools. *Id.* at 365–66, 95 S.Ct. at 1763. The Court reasoned that because "it would simply ignore reality to attempt to separate secular educational functions from the predominantly religious role performed by many of Pennsylvania's church-related elementary and secondary schools," *id.* at 365, 95 S.Ct. at 1763, "[s]ubstantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as a whole." *Id.* at 366, 95 S.Ct. at 1763–64.

In *Wolman,* the Court reaffirmed *Meek's* holding that the distinction between textbooks and other instructional materials and equipment is constitutionally significant. 433 U.S. at 250–51, 97 S.Ct. at 2606–07. The Court allowed the provision of textbooks to parochial school students, but prohibited the provision of neutral and secular instructional materials and equipment, such as tape recorders, record players, maps, and science kits, to the same students. *Id.* at 236–38, 248–51, 97 S.Ct. at 2599–60, 2605–07.

In reaffirming *Meek's* holding, however, *Wolman* undermined *Meek's* rationale. *Meek* rested on the principle that any state aid to the educational functions of a sectarian school is forbidden because " 'the secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined.' " *Meek,* 421 U.S. at 366, 95 S.Ct. at 1764 (citing *Lemon v. Kurtzman,* 403 U.S. at 657, 91 S.Ct. at 2133). *Wolman* eviscerated this principle by holding as constitutional a statute under which the State prepared and graded tests in secular subjects for all schools, including parochial schools, thereby relieving parochial schools of the cost of those functions. *Wolman,* 433 U.S. at 238–41, 97 S.Ct. at 2600–01. *Wolman* also noted that there is no constitutional distinction between providing instructional materials and equipment directly to the parochial school, as opposed to providing the instructional materials and equipment to the children, or parents of the children, attending the parochial school. *See Wolman,* 433 U.S. at 248, 97 S.Ct. at 2606 ("[T]he material at issue under the Ohio statute are loaned to the pupil or his parent. In our view, however, it would exalt form over substance if this

distinction were found to justify a result different from that in *Meek* "). Taken together, *Meek* and *Wolman* thus stood for the thin distinction—unmoored from any Establishment Clause principles—that state loans to parochial schools of instructional materials and equipment impermissibly advances religion, but state preparation and grading of tests and state loans of textbooks do not.[14]

In *Committee for Public Education v. Regan*, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980), the Supreme Court recognized this weak distinction and clarified that the provision of instructional materials and equipment to parochial schools is not always prohibited. The *Regan* Court upheld a law reimbursing parochial schools for the costs of administering tests required by the State. Distinguishing *Meek*, the Court stated,

> [A] majority of the Court, including the author of *Meek v. Pittenger*, upheld in *Wolman* a state statute under which the State, by preparing and grading tests in secular subjects, relieved sectarian schools of the cost of these functions, functions that they otherwise would have had to perform themselves and that were intimately connected with the educational processes. Yet the *Wolman* opinion at no point suggested that this holding was inconsistent with the decision in *Meek*. Unless the majority in *Wolman* was silently disavowing *Meek*, in whole or in part, that case was simply not understood by this Court to stand for the broad proposition that ["any aid to even secular educational functions of a sectarian school is forbidden, or more broadly still, that any aid to a sectarian school is suspect since its religious teaching is so pervasively intermixed with each and every one of its activities"].

*Regan*, 444 U.S. at 661, 100 S.Ct. at 850. The Court went on to state, " 'nor did *Meek* hold[ ] that all loans of secular instructional material and equipment' inescapably have the effect of direct advancement of religion." *Id.* at 661–62, 100 S.Ct. at 850–51 (quoting *Wolman*, 433 U.S. at 263, 97 S.Ct. at 2613–14 (Powell, J., concurring)). *Regan* thus instructs us that the difference between textbooks and other instructional equipment and materials, such as science kits and maps, is not of constitutional significance.

Rather than adopt the rigid "textbooks/other instructional materials" distinction made constitutionally suspect by *Regan*, we look to the underlying principle animating Establishment Clause jurisprudence: government neutrality towards religion. As noted earlier in this opinion, recent Supreme Court cases teach us that the touchstone of Establishment Clause analysis is whether the government is acting in a neutral manner towards religion. *See, e.g., Zobrest*, —— U.S. at ——, 113 S.Ct. at 2467 (stating that "[w]hen the government offers a neutral service on the premises of a sectarian school as part of a general program that is in no way skewed towards religion, it follows under our prior decisions that provision of that service does not offend the Establishment Clause") (internal quotations omitted); *Ball*, 473 U.S. at 382, 105 S.Ct. at 3221–22 (stating that the Court consistently requires the government "to maintain a course of neutrality among religions, and between religion and nonreligion"); *see also Committee for Public Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 792–93, 93 S.Ct. 2955, 2975, 37 L.Ed.2d 948 (1973) (stating that "[a] proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion"); *Board of Educ. of Kiryas Joel v. Grumet,*

---

**14.** Plaintiffs cite *Public Funds for Public Schs. v. Marburger*, 358 F.Supp. 29 (D.N.J.1973), *aff'd*, 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974), for the proposition that the state may not loan instructional materials and equipment to parochial school students or their parents. We find *Marburger* easily distinguishable. In *Marburger*, the Supreme Court affirmed by memorandum decision a three-judge district court judgment prohibiting the provision of instructional materials and equipment to parents of children who attended nonpublic schools. *Mar-*

*burger*, 358 F.Supp. at 37–38. Unlike the case at bar, however, the program in *Marburger* provided benefits only to a small class of citizens—the parents of children who attended nonpublic schools—rather than to all parents. The district court held that the primary effect of such a program would be to advance religion because the majority of nonpublic schools were religious. *Id.* at 36. Here, however, Chapter 2 provides benefits to all schools—public, secular private, and parochial.

—— U.S. ——, ——, 114 S.Ct. 2481, 2487, 129 L.Ed.2d 546 (1994) (same). Government neutrality becomes suspect when, in practical effect, the governmental aid is targeted at or disproportionately benefits religious institutions, or when, in symbolic effect, the governmental aid creates a symbolic union between church and state. We therefore must analyze (1) whether the Chapter 2 benefit at issue is a general welfare benefit neutrally available to a broad class of people without reference to religion, *Zobrest,* —— U.S. at ——, 113 S.Ct. at 2466, and (2) whether the benefit, even though generally available, creates a symbolic union of church and state. *Ball,* 473 U.S. at 389, 105 S.Ct. at 3226.

■ In applying these factors, we find that the primary effect of Chapter 2 neither advances nor inhibits religion. Chapter 2 benefits are neutrally available without regard to religion. In 1988–89, seventy-four percent of the benefits went to public schools. *See Walker v. San Francisco Unified School Dist.,* 741 F.Supp. 1386, 1404 (N.D.Cal.1990). Of the remaining twenty six percent, a substantial amount went to nonreligious private schools. Indeed, more than thirty percent of the private schools are nonreligious. Thus, the overwhelming percentage of beneficiaries are nonparochial schools and their students. Moreover, in 1989–90, the actual dollar amount budgeted to each student from Chapter 2 funds was a scant $6.65. Given such a *de minimis* amount of funding, it is no surprise that Chapter 2 funds are supplementary and cannot supplant the basic educational services of the religious schools.[15] Chapter 2 thus does not act as a subterfuge to channel money to religious schools, but rather, it resembles other governmental programs deemed constitutional due to the general applicability of benefits conferred. *See e.g., Mueller,* 463 U.S. at 398–99, 103 S.Ct. at 3068–69 (upholding state tax deductions for educational expenses); *Everson v. Board of Educ. of the Township of Ewing,* 330 U.S. 1, 16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947) (upholding reimbursement of school bus fares for parochial school students); *Witters,* 474 U.S. at 487–88, 106 S.Ct. at 751–52 (upholding scholarship to seminary student). As the Court recently stated in *Kiryas Joel,* "we have frequently relied explicitly on the general availability of any benefit provided religious groups or individuals in turning aside Establishment Clause challenges." *Kiryas Joel,* —— U.S. at ——, 114 S.Ct. at 2491.

Although it is possible that Chapter 2 benefits—even though generally available to all—will be improperly diverted by the parochial schools, we emphasize that controls are in place to prevent Chapter 2 benefits from being diverted to religious instruction. The textbooks and other instructional materials are prescreened, and title to them remains in the public agency. 20 U.S.C. § 2972(c)(1). Moreover, parochial schools pledge not to use Chapter 2 materials for religious purposes, and the District makes yearly monitoring visits. Finally, all services provided to private school students under Chapter 2 must be provided by employees of a public agency or through contract by the public agency with persons who, in the provision of those services, are independent of the private school and of any religious organizations. 20 U.S.C. § 2972(c)(2); 34 C.F.R. § 298.31(a)(4). We find that these controls adequately safe-

---

**15.** The Guideline distributed by the California State Board of Education to assist the LEA in implementing Chapter 2 states:

Chapter 2 funds must be used to acquire for the benefit of school children from private nonprofit schools secular, neutral, and non-ideological services, materials, and equipment. Materials, services, and equipment must be of direct educational benefit to the students and may not support the general operation of the school; e.g., a computer which is used for accounting or attendance purposes is unacceptable. . . .

An LEA is prohibited from using Chapter 2 funds for the purpose of providing direct aid to the private nonprofit school. An LEA may use Chapter 2 funds only to provide services that supplement the level of services that would, in the absence of Chapter 2 funds, be available to children enrolled in a private nonprofit school. Funds used to purchase requested equipment, materials, and services may not be commingled with nonfederal funds.

*See also* 34 C.F.R. 298.35(a)–(b) ("An LEA may only use chapter 2 funds to provide services that supplement, and in no case supplant, the level of services that would, in the absence of chapter 2 services, be available to children enrolled in a private school. . . . An LEA shall use chapter 2 funds to meet the needs of children enrolled in a private school, but not for the purpose of aiding the private school").

guard Chapter 2 benefits from improper diversion to religious use. Indeed, monitoring by the District has not uncovered a single instance of improper diversion, and plaintiffs have offered no evidence that any diversion has occurred. Under these circumstances, preventing parochial schools from participating in the generally available Chapter 2 program, based solely on the mere possibility that Chapter 2 benefits will be diverted, would unfairly discriminate against religion.

With respect to the symbolic union concern, we find that Chapter 2 does not create a symbolic union between church and state when it provides for the loaning of instructional materials and equipment to parochial schools. In *Zobrest,* the Court allowed the state to place a public employee in a sectarian school. The Court noted, "the Establishment Clause lays down no absolute bar to the placing of a public employee in a sectarian school." —— U.S. at ——, 113 S.Ct. at 2469. If having a public employee in the parochial school classroom does not "present[ ] the students with a graphic symbol of the 'concert or union or dependency' of church and state," *Ball,* 473 U.S. at 391, 105 S.Ct. at 3226 (internal citation omitted), then certainly having religiously neutral material and equipment in the same classroom does not create a symbolic union either. Moreover, in *Zobrest,* the interpreter provided translation for all classroom instruction, even if the instruction was religiously based. Here, the parochial schools certify that the equipment will not be used for religious instruction. We find no symbolic union distinction between providing textbooks and human interpreters, as opposed to providing instructional materials and equipment, to parochial schools.

Plaintiffs argue, however, that *Meek* and *Wolman* are indistinguishable from this case and should control our decision. We disagree. As noted above, *Regan* rejected the rigid, bright-line rule that a state may provide textbooks to parochial schools, but may never provide other instructional materials and equipment to such schools. *Regan,* 444 U.S. at 661, 100 S.Ct. at 850. Moreover, the statutes struck down in *Meek* and *Wolman* are fundamentally different from the Chapter 2 statute at issue here. The statute in *Meek* was not neutral because it provided close to $12 million in aid that was targeted directly at private schools, of which more than 75% were church-related. *Meek,* 421 U.S. at 364–65, 95 S.Ct. at 1762–63; *see also Zobrest,* —— U.S. at ——, 113 S.Ct. at 2468 (noting that "[i]n *Meek,* we struck down a statute that, *inter alia,* provided 'massive aid' to private schools—more than 75% of which were church related....").[16] Similarly, in *Wolman,* the statute was not neutral because it provided $88.8 million in aid that was targeted directly at private schools, of which 96% were church-related and 92% were Catholic. *Wolman,* 433 U.S. at 233, 97 S.Ct. at 2598.

Here, seventy-four percent of Chapter 2 benefits went to public schools. Of the remaining twenty-six percent—which was $195,482 in the 1988–89 school year—a substantial portion was allocated to nonreligious private schools. Indeed, over thirty percent of the private schools under the Chapter 2 program are nonreligious. Thus, unlike the statutes at issue in *Meek* and *Wolman,* Chapter 2 is a neutral, generally applicable statute that provides benefits to all schools, of which the overwhelming beneficiaries are nonparochial schools. Chapter 2 does not act as a

---

**16.** The *Zobrest* Court distinguished *Meek* along the lines that the aid in *Meek* constituted substantial aid to the parochial school. *Zobrest,* —— U.S. at ——, 113 S.Ct. at 2468. We find it difficult, however, to square the substantial aid inquiry with the fact that *Meek* allowed the massive provision of textbooks to parochial schools. *Meek,* 421 U.S. at 362, 95 S.Ct. at 1761–62.

Perhaps the difference lies in the fact that the textbooks in *Meek* were loaned to the students, whereas the instructional materials and equipment were loaned to the school. *Wolman,* however, noted that it would "exalt form over sub-

stance" if this distinction were constitutionally significant. *Wolman,* 433 U.S. at 248, 97 S.Ct. at 2606. Indeed, we see little difference in loaning science kits to students who then bring the kits to school as opposed to loaning science kits to the school directly.

Even under the substantial aid inquiry, however, the plaintiffs would lose. The overwhelming percentage of Chapter 2 benefits flows to nonparochial schools, Chapter 2 benefits are only supplementary, and the actual dollar amount budgeted for each student in 1988–89 was a scant $6.65.

subterfuge to channel services to religious institutions, nor does it provide a symbolic benefit to religion. Rather, the primary effect of Chapter 2 is to improve education for *all* school children. Chapter 2 neither advances nor inhibits religion.

### 3. Does Chapter 2 create excessive entanglement between church and state?

■ In order to ensure that the provision of Chapter 2 benefits remains neutral, controls are in place to prevent Chapter 2 benefits from being diverted to religious instruction. Textbooks and other instructional materials are prescreened and title to them remains in the public agency; parochial schools pledge not to use Chapter 2 materials for religious purposes; the District makes yearly monitoring visits; and all services provided to private school students under Chapter 2 must be provided by employees of a public agency or through contract by the public agency with persons who, in the provision of those services, are independent of the private school and of any religious organizations. Plaintiffs argue that these controls result in excessive entanglement between church and state. We disagree.

In *Aguilar*, the Court noted that the primary concern behind the excessive entanglement inquiry is that "the religious school ... must endure the ongoing presence of state personnel whose primary purpose is to monitor teachers and students in an attempt to guard against the infiltration of religious thought." 473 U.S. at 412, 105 S.Ct. at 3238. Here, unlike a human teacher who may be susceptible to the subtle or overt pressure of a pervasive sectarian atmosphere, *id.* at 412,

105 S.Ct. at 3238, neutral instructional materials and equipment are " 'self-polic[ing], in that starting as secular, nonideological and neutral, they will not change in use.' " [17] *Meek,* 349 U.S. at 365, 95 S.Ct. at 1763 (citation omitted). Indeed, this neutral and self-policing character of the instructional materials and equipment allows the parochial school to "endure" only one visit from the District a year, rather than to "endure the ongoing presence of state personnel."

Moreover, in *Bowen,* the Court noted that governmental monitoring of grants does not amount to excessive entanglement when the grants are provided to religious organizations that are not "pervasively sectarian." *Bowen,* 487 U.S. at 615, 108 S.Ct. at 2578. The "pervasively sectarian" distinction, however, has been diminished in the wake of *Zobrest.* In *Zobrest,* the Court did not find excessive governmental entanglement—indeed, the Court did not mention the third prong of *Lemon*—when it allowed the placement of a human interpreter in the pervasively sectarian environment of a parochial school classroom. —— U.S. at ——, 113 S.Ct. at 2469. We follow *Zobrest*'s lead and conclude that the Chapter 2 controls do not lead to excessive entanglement between church and state.

Thus, Chapter 2 funding passes all three prongs of the *Lemon* test. Chapter 2's valid secular purpose is the improvement of education; Chapter 2 does not have the primary effect of advancing or inhibiting religion because it distributes benefits to all schools without reference to religion and does not create a symbolic union between church and state; and Chapter 2 does not create excessive entanglement between church and state.

---

**17.** Plaintiffs cite *Marburger* for the proposition that instructional materials and equipment may still be put to religious uses. 358 F.Supp. at 38–39. *Meek,* however, was decided after *Marburger.* Moreover, both *Meek* and *Wolman* (which was also decided after *Marburger* ) struck down the instructional equipment and materials under the primary effects prong of *Lemon,* not the excessive entanglement prong.

We find it worth noting that under the plaintiff's rationale, textbooks can also be considered as divertible to religious use. The plaintiffs state in their reply brief that "[e]ven a tape on literary masterpieces can be used as a foundation for a follow-up session of religious indoctrination." Plaintiff's Reply Brief, at 17. A textbook on literary masterpieces, however, can also be used as a foundation for a follow-up session of religious indoctrination. In addition, textbooks often contain other instructional materials within its pages, such as maps, which, according to the plaintiffs, could be divertible to religious use. Plaintiff's argument would thus force us to draw a constitutional distinction between a literary, geographical, or scientific textbook, and a literary tape, a geographical map, and a science kit, based simply on the mere assertion that somehow the tape, map, and science kits are divertible to religious use but the textbooks are not. We decline to draw such an untenable distinction.

Chapter 2 funding does not violate the Establishment Clause.

## CONCLUSION

We have sought to find a workable, practical approach to the valid public interest in improving education for all children, including those attending parochial schools. While the Establishment Clause does not prevent a "practical response to the logistical difficulties of extending needed and desired aid to all the children of the community," *Wolman,* 433 U.S. at 247 n. 14, 97 S.Ct. at 2605 n. 14, we must at the same time ensure that providing aid to parochial school students does not advance religion, and that the withholding of aid does not evince hostility toward religion. "Justice," Judge Learned Hand once observed, "is the tolerable accommodation of the conflicting interests of society." [18] Functional analysis, not formalistic line-drawing, is necessary in evaluating the competing values and policies at stake in this extraordinarily sensitive. area of constitutional law.

REVERSED IN PART and AFFIRMED IN PART. Each party is to bear its own costs.

FERNANDEZ, Circuit Judge, concurring and dissenting:

I concur in Part I of the majority opinion, but I dissent from Part II.

I agree with the majority's suggestion in Part II that a constitutional distinction between books for children and materials for schools is untenable. The thought that the latter might somehow be diverted to religious programs but that the former cannot be defies our knowledge of logic, science, human nature, and religion. Thus, I applaud the majority's attempt to dispense with the contrary holdings of *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) and *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977). I also applaud the majority's overall analysis, which ultimately looks upon the establishment clause as a kind of equal protection clause, deter-

18. Phillip Hamburger, *The Great Judge,* Life, Nov. 4, 1946, at 119, 122–23 (quoting Judge

mines that no special benefit is conferred upon parochial schools by the program at hand, and declares that no special detriment should be imposed upon parochial schools.

Nevertheless, I must dissent as to Part II because what the Supreme Court gives, the Supreme Court must take away. That Court has given us the books-for-kids versus materials-for-schools dichotomy. Only it can take it away. Thus, I think that the Chapter 2 program must cease insofar as it provides for direct loans of materials to parochial schools. As I see it, there is little significance to the fact that the materials themselves are *not* religious. Neither, one would think, were the maps, globes, science kits, weather forecasting charts, and other materials referred to in *Meek,* 421 U.S. at 362–66, 95 S.Ct. at 1762–64, and *Wolman,* 433 U.S. at 248–51, 97 S.Ct. at 2605–07.

Therefore, I respectfully and reluctantly dissent from the majority's determination in Part II of the opinion.